UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
26-mc-43 PJS

---

IN RE GRAND JURY SUBPOENAS
Nos.  2022R00519-A, 2022R00519-B,
2022R00519-C, 2022R00519-D,
2022R00519-E, 2022R00519-F

ORDER

---

Joseph S. Teirab and Flavio S. de Abreu, UNITED STATES ATTORNEY'S OFFICE, for the United States.

Joseph T. Dixon, Manda M. Sertich, Amanda M. Mills, Erik E. Money, and Megan M. Helstrom, FREDRIKSON & BYRON, P.A., for Governor Tim Walz.

Liz Kramer, MINNESOTA ATTORNEY GENERAL'S OFFICE, for the Office of the Governor of Minnesota.

Marshall Miller, Sean Hecker, Trisha Anderson, and Kaitlin Konkel, HECKER FINK LLP; Andrew Mohring, GOETZ & ECKLAND P.A., for Mayor Jacob Frey.

Kristyn Anderson, Daniel Abelson, and Heather P. Robertson, MINNEAPOLIS CITY ATTORNEY'S OFFICE, for the Office of the Mayor of Minneapolis and the City of Minneapolis.

Brendan V. Johnson, Timothy Billion, and Bahram Samie, ROBINS KAPLAN LLP, for Mayor Kaohly Her and the City of St. Paul.

Nicole Engisch, DORSEY & WHITNEY LLP; Surya Saxena, Nicholas Scheiner, Emily M. McAdam, and Farah N. Famouri, GREENE ESPEL PLLP, for Attorney General Keith Ellison.

Liz Kramer and Timothy C. Rank, MINNESOTA ATTORNEY GENERAL'S OFFICE, for the Office of the Minnesota Attorney General.

Steven L. Schleicher, MASLON LLP, for the Ramsey County Board of Commissioners.

FILED 6/17/2026
KATE M. FOGARTY

JUDGMENT ENTD_____
DEPUTY CLERK _____

Ben Schweigert, Alan A. Martinson, and Brittany McCormick, HENNEPIN COUNTY ATTORNEY'S OFFICE, for Hennepin County.

Matthew Ebert and Samantha Pauley, BALLARD SPAHR LLP, for Members of the Hennepin County Board of Commissioners.

On January 20, 2026, six federal grand-jury subpoenas were served on the record custodians for (1) the Minnesota Governor's office; (2) the Minneapolis Mayor's office; (3) the St. Paul Mayor's office; (4) the Minnesota Attorney General's office; (5) the Ramsey County Board of Commissioners; and (6) the Hennepin County Board of Commissioners. Broadly speaking, the subpoenas require the production of records relating to enforcement of federal immigration laws going back to January 1, 2025.

This matter is before the Court on six motions to quash the subpoenas. The moving parties are Governor Tim Walz, in his personal capacity; the Office of the Governor; Mayor Jacob Frey, in his personal capacity; the Office of the Mayor of Minneapolis; the City of Minneapolis; Mayor Kaohly Her; the City of St. Paul; Attorney General Keith Ellison; the Office of the Minnesota Attorney General; the Ramsey County Board of Commissioners; Hennepin County; and Members of the Hennepin

County Board of Commissioners.[1]  For the reasons that follow, the motions are granted, and the subpoenas are quashed.

## I. BACKGROUND

The following factual background is taken from the news reports and other publicly available sources cited in the moving parties' briefs.  The U.S. Department of Justice ("Department") raised no objection to movants' reliance on these sources and did not dispute the movants' description of the facts gleaned from these sources.

From the beginning of his current term in office, President Trump and members of his administration have taken aim at so-called "sanctuary" jurisdictions—that is, jurisdictions "that limit the use of local resources to assist in federal immigration enforcement."  *City & Cnty. of S.F. v. Trump*, 783 F. Supp. 3d 1148, 1161 (N.D. Cal. 2025).  President Trump has repeatedly insulted Minnesota generally and its Somali

---

[1]The government has not challenged the moving parties' standing to bring the motions to quash.  Whether Article III standing is necessary to bring a motion to quash a grand-jury subpoena appears to be an unsettled question.  *Contrast In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *4 (D.D.C. Mar. 13, 2026) ("Unlike with challenges to Article III standing, one can waive challenges to standing to quash a subpoena."), *reconsideration denied*, 2026 WL 1224046 (D.D.C. Apr. 3, 2026), *with In re Grand Jury*, 705 F.3d 133, 142 (3d Cir. 2012) ("Although the Government does not challenge Appellants' standing, we are obliged to address it *sua sponte*.").  Even if Article III standing is necessary, however, there is no question that at least one movant with respect to each subpoena possesses such standing.  Specifically, the official movants are each seeking to quash subpoenas directed to records belonging to them or their offices, and thus they clearly have "a sufficiently important, legally-cognizable interest in the materials or testimony sought."  *In re Grand Jury*, 705 F.3d at 142 (cleaned up).

-3-

population in particular;[2] targeted Democratic-led cities for expanded deportation

efforts;[3] asserted that Democratic officials who oppose the deployment of National

Guard troops for immigration enforcement should be jailed;[4] issued multiple executive

orders threatening to cut off federal funding to "sanctuary" jurisdictions;[5] and sued

Minnesota and some of its political subdivisions seeking to invalidate state and local

provisions limiting assistance to federal immigration officials. *United States v.
Minnesota*, No. 25-CV-3798 (ECT/JFD), ECF No. 1 at 32–33 (D. Minn. filed Sept. 29,

2025).

In December 2025, the Trump administration launched "Operation Metro

Surge," a sweeping immigration-enforcement operation in Minnesota.  At the height of

---

[2]*See, e.g.*, Howard Thompson, *Pres. Trump rails against Somalis: 'They've destroyed Minnesota'*, Fox 9, Dec. 3, 2025, https://perma.cc/B5V2-G69A (reporting that President Trump called Mayor Frey a "fool," said Governor Walz "should be ashamed," told Rep. Ilhan Omar to "go back to your own country," and called Minnesota a "hellhole").

[3]Samantha Waldenberg & Priscilla Alvarez, *Trump orders ICE officers to expand deportation efforts in Democratic cities*, CNN, June 16, 2025, https://perma.cc/88DS-TG5B.

[4]Michelle L. Price & Sophia Tareen, *Trump says Illinois governor and Chicago mayor should be jailed as they oppose Guard deployment*, AP News, Oct. 8, 2025, https://perma.cc/L7D9-UVAD; *see also* Maria Sacchetti & Jeremy Roebuck, *DOJ threatens to prosecute local officials over immigration enforcement*, Wash. Post, Jan. 22, 2025, https://perma.cc/8N4H-HXVX.

[5]*See* Exec. Order No. 14,159 § 17, 90 Fed. Reg. 8443 (Jan. 20, 2025); Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025); Exec. Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025).

the surge, more than 3,000 Department of Homeland Security ("DHS") agents were

working in the state.[6] The surge was the largest civil immigration enforcement

operation in DHS history,[7] despite the fact that the percentage of Minnesota's

population consisting of undocumented immigrants is estimated to be less than half the

national average.[8] During the surge, there were widespread reports of DHS agents

engaging in abusive and dangerous tactics seemingly designed to escalate tensions and

destabilize the community.[9] Also during the surge, two American citizens—Renee

---

[6]*ICE in MN: More than 3,000 federal agents in MN for Operation Metro Surge, DOJ attorney says*, Fox 9, Jan. 26, 2026, https://perma.cc/B6QQ-CWED.

[7]Rebecca Santana & Mike Balsamo, *Homeland Security plans 2,000 officers in Minnesota for its 'largest immigration operation ever'*, AP News, Jan. 6, 2026, https://perma.cc/KP7D-HTB2.

[8]Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, Minn. Dep't of Emp. & Econ. Dev., March 2025, https://perma.cc/J58B-9M3Q.

[9]Katelyn Vue, *U.S. citizen offered to show I.D. but was arrested by immigration officers in Cedar-Riverside*, Sahan Journal, Dec. 9, 2025, https://perma.cc/CMM5-PGGP; *No school for MPS rest of the week; Apparent ICE presence at Roosevelt High School causes choatic scene*, KSTP, Jan. 8, 2026, https://perma.cc/CS7L-JGXY; Shaquille Brewster, Natasha Korecki & Nicole Acevedo, *Immigration agents deploy tear gas, pepper spray in Minneapolis as confrontations with protesters grow*, NBC News, Jan. 13, 2026, https://perma.cc/9256-74YS; Joe Sommerlad, *Woman dragged from car by ICE agents yells 'I'm disabled' in chaotic scene in Minneapolis*, The Independent, Jan. 14, 2026, https://perma.cc/W4LA-H6UJ; Maia Coleman, *ICE Arrest of a Citizen, Barely Dressed, Sows Fear in Twin Cities*, N.Y. Times, Jan. 21, 2026, https://perma.cc/3ZKU-9445; Joe Augustine, *ICE agents are detaining kids...from teens to toddlers*, Fox 9, Jan. 23, 2026, https://perma.cc/PFT8-EGXU; Priscilla Alvarez, Chris Boyette & Amanda Musa, *5-year-old boy taken by ICE in Minneapolis area being held with father at Texas facility*, CNN, Jan. 23, 2026, https://perma.cc/Z8P3-AKAV; Lisa

(continued...)

Good and Alex Pretti—were killed by DHS agents.[10]

On January 12, 2026, the State of Minnesota and the cities of Minneapolis and St. Paul filed a lawsuit challenging Operation Metro Surge. *See Minnesota v. Noem*, No. 26-CV-0190 (KMM/DJF) (D. Minn. 2026). The next day, President Trump posted a message on social media implying that Minnesota officials' lack of cooperation with federal immigration officials was allowing "thousands of already convicted murderers, drug dealers and addicts, rapists, violent released and escaped prisoners, dangerous people from foreign mental institutions and insane asylums, and other deadly criminals too dangerous to even mention" to roam free and promising the "GREAT PEOPLE OF MINNESOTA" that "THE DAY OF RECKONING & RETRIBUTION IS COMING!"[11] President Trump also threatened to cut off all federal funding to Minnesota and other "sanctuary" states and cities, ominously warning that "Minnesota is going to have to

---

[9](...continued)
Kashinksy & Natalie Fertig, *'Our cities are no longer safe': GOP mayors condemn Trump immigration enforcement*, Politico, Jan. 28, 2026, https://perma.cc/5QTY-7MAV.

[10]Aaron C. Davis & Jonathan Baran, *Video shows ICE agent in Minneapolis fired at driver as vehicle veered past him*, Wash. Post, Jan. 8, 2026, https://perma.cc/XSX2-65SD; Cheryl W. Thompson, *Man shot dead by federal immigration officers in Minneapolis*, NPR, Jan. 24, 2026, https://perma.cc/W78Z-S4GZ.

[11]Donald Trump, Truth Social, Jan. 13, 2026, https://perma.cc/4PR9-S5AS.

take care of itself for a little while."[12] On January 14, then-Deputy Attorney General Todd Blanche accused Walz and Frey of "encouraging violence against law enforcement" and vowed that he would stop their "terrorism by whatever means necessary."[13]

Beginning just a couple of days later, on January 16, a number of media outlets reported that the Department was investigating Walz and Frey for impeding federal law-enforcement officers and planned to issue grand-jury subpoenas to the two officials.[14] One outlet identified one of its sources as a "U.S. official."[15]

The same day that news of the investigation and subpoenas first leaked, members of the Trump administration made public statements directly or indirectly claiming that Minnesota officials were breaking the law by opposing the

---

[12]Jeff Wald, *President Trump cutting federal funding to Minnesota starting Feb. 1*, Fox 9, Jan. 13, 2026, https://perma.cc/56LH-CX5S.

[13]Todd Blanche, X, Jan. 14, 2026, https://perma.cc/ASZ4-LAZF. Notably, Blanche's post was in response to a report of an assault on ICE agents that turned out to be fabricated by the agents. Those agents are reported to be under federal investigation. Lauren Mascarenhas & Caroll Alvarado, *ICE's story of a Minneapolis shooting fell apart*, CNN, Apr. 7, 2026, https://perma.cc/3BJ4-XWYL.

[14]*See, e.g.*, Perry Stein, *Justice Dept. launches criminal investigation of Minnesota governor*, Wash. Post, Jan. 16, 2026, https://perma.cc/EQZ5-GMRP; Camilo Montoya-Galvez, Jennifer Jacobs & Sarah N. Lynch, *DOJ investigating Gov. Tim Walz, Minneapolis Mayor Jacob Frey over alleged conspiracy to impede immigration agents*, CBS News, Jan. 17, 2026, https://perma.cc/MTA2-AQWE.

[15]Montoya-Galvez et al., *supra* n.14.

administration's conduct in Minnesota.  The White House website published an article entitled "Minnesota's 'Sanctuary' Defiance Has Consequences."  That article asserted that "the responsibility for the enhanced enforcement operations in Minnesota—and the tension and violence—lies squarely with these [state and local] officials who refuse to partner with the Trump Administration and instead put their Radical Left agenda over public safety and the rule of law."[16]  Blanche asserted in an interview that "[w]hen the governor or the mayor threaten our officers, when the mayor suggests that he's encouraging citizens to call 911 when they see ICE officers, that is very close to a federal crime."[17]  Then-Attorney General Pamela Bondi posted on social media, "A reminder to all those in Minnesota: No one is above the law."[18]

As noted, the subpoenas were served on January 20 and are directed to the custodians of records for the Governor's office, the Minneapolis and St. Paul Mayors' offices, the Attorney General's office, and the Boards of Commissioners for both Hennepin and Ramsey Counties.  Each subpoena requires the custodian to appear, testify, and produce specific materials within his or her custody and control.

---

[16]The White House, *Minnesota's 'Sanctuary' Defiance Has Consequences*, Jan. 16, 2026, https://perma.cc/6VPE-J8D7.

[17]Alexandra Koch, David Spunt & Matt Finn, *Federal prosecutors open investigation into Walz, Frey over alleged impeding of law enforcement*, Fox News, Jan. 16, 2026, https://perma.cc/C8Y9-7BZQ.

[18]Pamela Bondi, X, Jan. 16, 2026, https://perma.cc/695E-UQSU.

The subpoenas are not identical, but all of them direct the production of extremely broad categories of records relating to federal immigration enforcement in Minnesota. For example, the subpoena served on the records custodian for the Minneapolis Mayor's office directs the production of the following:

1. All records, including but not limited to communications, policies, manuals, procedures, directives, commands, instructions, guidance, reference guides, and suggestions, issued by the Office of the Mayor of Minneapolis (Mayor's Office), since January 1, 2025, relating to federal immigration enforcement in the State of Minnesota.

2. All records, including but not limited to communications, policies, manuals, procedures, directives, commands, instructions, guidance, reference guides, and suggestions, issued or possessed by the Mayor's Office, since January 1, 2025, relating to cooperation or lack of cooperation with federal immigration authorities.

3. All records, from January 1, 2025 to the present, including but not limited to communications, policies, manuals, procedures, directives, commands, instructions, guidance, reference guides, and suggestions, relating to the Mayor's Office response to requests for assistance from immigration officials (including any records tending to show a refusal to come to the aid of immigration officials).

4. From January 1, 2025 to the present, all records and communications relating to compliance or lack of compliance with immigration detainers in the State of Minnesota.

5. From January 1, 2025 to the present, all communications, including but not limited to emails, letters, memoranda, text messages, chats, IMs, and voice recordings, within the custody and control of the Mayor's Office, to and from any political or governing body within the State of Minnesota, including the Office of the Governor of the State of Minnesota, the Hennepin County Board of Commissioners, and the Minneapolis Police Department, relating to federal immigration enforcement in the State of

Minnesota.

6. From January 1, 2025 to the present, all guidance, presentations, directives, or training literature provided to the Mayor's Office employees, contractors, or Minnesota residents regarding cooperating or complying with immigration officers[.]

7. From January 1, 2025 to the present, all guidance, presentations, directives, or training literature provided to the Mayor's Office employees, contractors, or Minnesota residents relating hindering [sic] doxxing, identifying, or surveilling immigration officers.

8. From January 1, 2025 to the present, all guidance, presentations, directives, or training literature issued to the Mayor's Office employees, contractors, or Minnesota residents regarding interacting with immigration officers[.]

Mot. of Minneapolis & Frey to Quash, Ex. A.

On January 24, four days after the subpoenas were served, Bondi wrote a letter to Governor Walz.[19] The letter demanded that the Governor "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota" by doing the following: (1) sharing all of Minnesota's records on Medicaid and Food and Nutrition Service programs with the federal government; (2) repealing "sanctuary policies" and requiring all detention facilities to cooperate fully with ICE; and (3) giving the Department access to Minnesota's voter rolls. The letter's concluding paragraph stated that "[t]he time has come for state and local officials in your state to change course. . . . Minnesota can and should be a partner with this administration." According to the *New*

---

[19]Pamela Bondi, Letter to Tim Walz, Jan. 24, 2026, https://perma.cc/QF5D-6B6P.

-10-

*York Times*, Trump aides helped draft the letter.[20]  Bondi described the letter on Fox

News, saying that "[w]e said [Walz] BETTER support President Trump, the men and

women in law enforcement."[21]

## II.  ANALYSIS

### A.  Standard of Review

Grand juries have broad investigatory powers.  *See United States v. Calandra*, 414

U.S. 338, 343 (1974) ("Traditionally the grand jury has been accorded wide latitude to

inquire into violations of criminal law.").  A grand jury can demand the testimony of

witnesses and the production of evidence without any showing of probable cause.  *See*

*United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991).  "The jurors may act on tips,

rumors, evidence offered by the prosecutor, or their own personal knowledge."  *United*

*States v. Dionisio*, 410 U.S. 1, 15 (1973).  Grand juries are generally "unrestrained by the

technical procedural and evidentiary rules governing the conduct of criminal trials."

*Calandra*, 414 U.S. at 343; *see also United States v. Williams*, 504 U.S. 36, 49 (1992)

("[A]lthough the grand jury may not force a witness to answer questions in violation of

the Fifth Amendment's constitutional guarantee against self-incrimination, our cases

suggest that an indictment obtained through the use of evidence previously obtained in

---

[20]Alan Feuer & Glenn Thrush, *Justice Dept. Playbook in Minnesota: Investigate Foes, Protect Allies*, N.Y. Times, Jan. 29, 2026, https://perma.cc/8REW-BW2U.

[21]Pamela Bondi, X, Jan. 24, 2026, https://perma.cc/DV5T-VSU7.

violation of the privilege against self-incrimination is nevertheless valid." (cleaned up)).

"The investigatory powers of the grand jury are nevertheless not unlimited." *R. Enters.*, 498 U.S. at 299.  Under Fed. R. Crim. P. 17(c)(2), a court may quash a grand-jury subpoena "if compliance would be unreasonable or oppressive."  In addition, grand juries may not "select targets of investigation out of malice or an intent to harass."  *R. Enters.*, 498 U.S. at 299; *see also Trump v. Vance*, 591 U.S. 786, 805 (2020) (explaining that "grand juries are prohibited from engaging in 'arbitrary fishing expeditions' and initiating investigations 'out of malice or an intent to harass'" (quoting *R. Enters.*, 498 U.S. at 299)).  A subpoena may be quashed if its "dominant" purpose is improper, even if it was issued partly for valid reasons.  *United States v. Wadlington*, 233 F.3d 1067, 1074 (8th Cir. 2000) ("It is well-settled that it is improper to summon a witness before the grand jury 'for the sole or dominant purpose of preparing a pending indictment for trial.'" (quoting *United States v. Puckett*, 147 F.3d 765, 770 (8th Cir. 1998))); *see also In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, No. MC 26-12 (JEB), 2026 WL 710202, at *5 (D.D.C. Mar. 13, 2026) ("Almost all our sister circuits agree that a subpoena should be quashed if its 'sole or dominant' purpose is improper (or some variation of those words)."), *reconsideration denied*, 2026 WL 1224046 (D.D.C. Apr. 3, 2026).

Likewise, a subpoena may be quashed as "unreasonable or oppressive" under

-12-

Fed. R. Crim. P. 17(c)(2) even if it seeks relevant evidence. *See In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d 768, 773 (8th Cir. 2020) (rejecting the Department's argument that the grand jury is entitled to all relevant and unprivileged evidence and holding that "a district court has discretion to quash a subpoena under Rule 17(c)(2) if it 'intrudes gravely on significant interests outside of the scope of a recognized privilege'" (quoting *In re Grand Jury, John Doe No. G.J.2005-2*, 478 F.3d 581, 585 (4th Cir. 2007))); *United States v. Kalter*, 5 F.3d 1166, 1169 (8th Cir. 1993) (affirming grant of motion to quash because "the burden of producing the records sought greatly outweighed any relevance they might have to the case"); *Schwimmer v. United States*, 232 F.2d 855, 862–63 (8th Cir. 1956) (quashing an overbroad subpoena as unreasonable but finding that a narrower subpoena more tailored to the documents likely to be relevant was reasonable).

"[A] grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness must be on the recipient who seeks to avoid compliance." *R. Enters.*, 498 U.S. at 301; *see also Universal Mfg. Co. v. United States*, 508 F.2d 684, 685 (8th Cir. 1975) (per curiam) (explaining that challengers to a grand-jury subpoena bear the burden of overcoming the presumption of regularity that attaches to grand-jury proceedings).

*B. Motions to Quash*

The moving parties argue that the subpoenas should be quashed for a number of reasons. The Court need address only one of those reasons: the moving parties' contention that the subpoenas were issued as part of an unconstitutional effort to coerce Minnesota officials into assisting the federal government with enforcing civil immigration laws and to harass and retaliate against them for failing to do so. The Court agrees with the moving parties.[22]

Under the Tenth Amendment's "anti-commandeering" rule, the federal government may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997) (invalidating federal law requiring state officials to conduct background checks on prospective handgun purchasers); *see also New York v. United States*, 505 U.S. 144, 188 (1992) ("The Federal Government may not compel the States to enact or administer a federal regulatory program."). Nor may the federal government coerce or retaliate against states or political subdivisions who decline to help the federal government enforce federal laws. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578, 581 (2012) (plurality opinion) (explaining that the federal

---

[22]Because the Court agrees with the movants' Tenth Amendment argument, the Court need not address the remaining bases on which they contend that the subpoenas should be quashed. Notably, the Department's brief did not acknowledge, much less engage with, movants' arguments with respect to the Tenth Amendment.

government may not "indirectly coerce[] a State to adopt a federal regulatory system as its own" and finding that the threat of withholding existing Medicaid funds to induce states to accept the Medicaid expansion was an impermissible "gun to the head"). This is as true in the context of immigration enforcement as it is in the context of other federal regulatory programs. *See United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019) ("California has the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration enforcement] efforts.").

Initiating a criminal investigation in order to harass political opponents or to coerce them into taking official action—particularly official action that the federal government cannot directly require those political opponents to take—is a blatantly unlawful and unethical use the grand-jury process. *See In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *6 ("[I]f prosecutors are forbidden from meddling with an official's duties, then they cannot use criminal investigations to pressure him into enacting their preferred policies."). The only question, then, is whether the challenged subpoenas were issued for one of these forbidden purposes.

The Court has no doubt that they were. On the one hand, the evidence that the challenged subpoenas were issued for unlawful reasons is overwhelming. On the other hand, the Department has struggled—without success—to identify a single plausible

-15-

investigatory justification for the subpoenas.[23] *Cf. In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at \*7 (explaining that "the strength of a movant's evidence of an improper purpose determines how much the Government must show to substantiate its asserted proper purpose").  To elaborate:

*First*, the public record, as recited above, is replete with direct evidence of the Trump administration—including the highest-ranking officials of the Department— threatening and attempting to punish states and localities that have adopted "sanctuary" policies, as well as attempting to coerce those states and localities to devote resources to assist federal immigration enforcement.  Just to cite some of the highlights:

- President Trump has repeatedly directed the withholding of federal funding from "sanctuary" jurisdictions, sued Minnesota and its political subdivisions to invalidate their "sanctuary" policies, and unleashed vitriolic tirades against Minnesota officials for not assisting the federal government in enforcing federal immigration laws.

- The day after Minnesota, Minneapolis, and St. Paul filed a lawsuit challenging Operation Metro Surge, President Trump posted a message on social media criticizing Minnesota's failure to cooperate with ICE and promising the "GREAT PEOPLE OF MINNESOTA" that "THE DAY OF RECKONING & RETRIBUTION IS COMING!" Again, President Trump explicitly threatened "RETRIBUTION"

---

[23]As noted, a party moving to quash a grand-jury subpoena normally bears the burden of overcoming the presumption of regularity.  Some of the movants argue that the presumption should not apply here because, they contend, the subpoenas were not "issued through normal channels."  *R. Enters.*, 498 U.S. at 301.  The Court need not address this issue because it finds that, even if the presumption applies, the moving parties have overcome it.

against Minnesota's political leaders for exercising their constitutional right to decline to cooperate with ICE.

- Three days after President Trump threatened this "RETRIBUTION," someone leaked the existence of the grand-jury subpoenas directed to Governor Walz's and Mayor Frey's offices to multiple media outlets, at least one of which cited "U.S. officials" as its source.

- Also on the day of the leaks, the significance of the subpoenas was boosted by a seemingly coordinated media campaign that included (1) the publication on the official White House website of an article warning that "Minnesota's 'Sanctuary' Defiance Has Consequences" and expressly linking "the enhanced enforcement operations in Minnesota" with the conduct of state and local "officials who refuse to partner with the Trump Administration"; (2) a media appearance by then-Deputy Attorney General Blanche suggesting that the "governor" and "mayor"—that is, the officials who were most closely tied to the two leaked subpoenas—may have committed federal crimes; and (3) a post from then-Attorney General Bondi with a warning to "all those in Minnesota: No one is above the law."

- Finally, a few days after the subpoenas were served, Bondi sent a letter to Walz demanding, among other things, that Minnesota repeal its "sanctuary" policies. In an interview that same day, Bondi characterized the letter as demanding that Walz "BETTER support President Trump."

This course of events—in and of itself—establishes beyond reasonable dispute that the subpoenas were a part of a broader campaign to coerce state and local officials in Minnesota to assist the Trump administration in its enforcement of immigration laws. And, of course, this campaign played out against the backdrop of the Trump administration's well-established history of using criminal investigations to retaliate

-17-

against and pressure the President's political and personal adversaries. *See In re Grand Jury Subpoenas Nos. [Redacted] & [Redacted]*, 2026 WL 710202, at *3 (observing that "[b]eing perceived as the President's adversary has become risky in recent years" and citing numerous recent examples); *id.* at *8 ("A mountain of evidence suggests that the dominant purpose [of the subpoenas at issue] is to harass [Federal Reserve Chair Jerome] Powell to pressure him to lower [interest] rates.").

*Second*, the Department's asserted investigatory purpose for the challenged subpoenas is risible. Recall that the subpoenas seek broad categories of materials—going back to *January 1, 2025*, roughly a year before Operation Metro Surge began—relating to federal immigration enforcement in Minnesota and state officials' cooperation (or lack thereof) with federal immigration officials. It is important to stress, once again, that the Constitution forbids the federal government from forcing states or their political subdivisions to enforce federal laws. Indeed, the Supreme Court has emphasized that this dual-sovereign design is a fundamental part of the Constitution, intended to safeguard liberty from overreach by the federal government. *See, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) ("Perhaps the principal benefit of the federalist system is a check on abuses of government power."). Consequently, the State of Minnesota and its political subdivisions have the right—a right grounded in the bedrock constitutional principle of federalism—to decline to devote their resources to

-18-

furthering the Trump administration's enforcement of federal immigration laws. On their face, therefore, the subpoenas are directed to investigating activity that is not only legal, but constitutionally protected from interference by the very federal government that issued the subpoenas. *Id.* at 459 ("These twin powers will act as mutual restraints only if both are credible. In the tension between federal and state power lies the promise of liberty.").

The challenged subpoenas are extraordinarily broad. They are directed to a wide swath of the state's political leadership, including the governor, the attorney general, the mayors of the state's two largest cities, and the boards of the state's two largest counties. They seek materials that largely if not entirely relate to constitutionally protected conduct. The Department has launched a significant incursion into matters that the Constitution reserves to sovereign states, and one would expect that the Department would not have done so unless it was aware of compelling evidence of criminal or at least suspicious behavior.

The Department claims that the subpoenas are part of an investigation into possible violations of 8 U.S.C. § 1324, 18 U.S.C. § 1505, and 18 U.S.C. § 111.[24] Section 1324 criminalizes concealing an alien in knowing or reckless disregard of the fact that

---

[24]The Department also cites 18 U.S.C. § 371, the general conspiracy statute. The Department did not identify an object of the conspiracy, but presumably the object would be to violate one of the other cited statutes.

-19-

the alien is illegally in the United States. Sections 1505 and 111, roughly speaking, criminalize obstructing or interfering with a governmental function. The Department points to four examples of state and local officials' conduct that, it contends, justify launching an investigation into potential violations of these statutes and issuing the subpoenas:[25]

- In December 2025, Minneapolis City Council Member Aurin Chowdhury authored an amended "Separation Ordinance"[26] requiring that any city official who becomes aware of ICE activity report that information to the City Council. The Department suggests that such information could be "disseminated in a manner that enables individuals or organizations to anticipate, evade, or interfere with federal enforcement actions." Gov't Response Br. at 6.

---

[25] The Department initially identified five examples in its pre-hearing brief, but failed to provide any record support or citations to public documents to substantiate or even fully identify them. At the hearing on the motions to quash, the Court ordered the Department to provide the missing factual support. In its post-hearing submission, the Department admitted that it could find no verifiable source to support its claim that St. Paul Mayor Kaohly Her vowed to "fight all subpoenas." Accordingly, the Department has withdrawn "its prior characterization that officials refused to comply with subpoenas and does not rely on that assertion as a basis for the issuance of the grand jury subpoenas." Abreu Decl. ¶ 7.

[26] The Separation Ordinance generally governs "the communication and enforcement relationship" between Minneapolis and federal civil immigration authorities. Minneapolis, Minn. Ordinances tit. II, § 19.10.

-20-

- In January 2026, in the course of publicly advocating that Governor Walz enact an eviction moratorium, Minneapolis City Council Member Robin Wonsley stated that "[n]o family should have to choose between keeping a roof over their heads and risking being kidnapped by ICE."[27]

- In late 2025, Ramsey County disseminated internal guidance via email instructing employees that "no data or document should be provided to the ICE agent, regardless of warrant or subpoena."[28] Schleicher 2d Decl. Ex. 1.

- At some unidentified time, Hennepin County disseminated training materials and held a virtual training for its staff that instructed staff about how they should respond if ICE agents present a warrant or demand to apprehend someone. With respect to warrants, the training instructs staff to ask for a few minutes to contact someone in leadership. With respect to demands for apprehension, the training instructs staff to provide no information, refuse consent to entry, escalate to a supervisor, and engage in "respectful stalling" (which is not defined). The training further instructs that if the agent threatens to use or uses force, staff should not obstruct the agent. Abreu Decl. ¶ 5 & Exs. 1–3.

One of the most obvious problems with these four examples is that two of them involve legislative or advocacy activity by members of the Minneapolis City Council, an independent political entity that is not a participant in this proceeding and (as far as the

---

[27]Robin Wonsley et al., *Request for Committee Action*, Jan. 15, 2026, https://lims.minneapolismn.gov/RCA/25984.

[28]Curiously, despite the fact that the Ramsey County Board of Commissioners provided a copy of the guidance with its response brief, the Department's post-hearing submission states that it cannot provide any record support for it. Abreu Decl. ¶ 6. The Court proceeds on the assumption that the exhibit provided by the Ramsey County Board contains the guidance at issue. To the extent that the Department may have been referring to a different document, the Department has failed to provide support for such a document, and the Court disregards its possible existence.

-21-

Court is aware) was not served with a subpoena. So half of the examples of suspicious activity cited by the Department involve people whom the Department did *not* subpoena.

Even if these two examples were relevant, the connection between them and any possible criminal conduct is so remote as to be spurious. The Department suggests that requiring city officials to report known ICE activity to the City Council could result in the dissemination of that information—and that dissemination of that information could, in turn, result in other individuals evading or interfering with future ICE activity. This reasoning piles speculation upon speculation, while also taking aim at perfectly legal—indeed, constitutionally protected—behavior. As a general matter, any citizen who happens across law-enforcement activity has a constitutional right to observe it, to record it, and to mention it to anyone they'd like—including members of the Minneapolis City Council. *Cf. Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (finding that the First Amendment right to observe and record police activity in public is clearly established).

With respect to a single city council member's request that the Governor impose an eviction moratorium: The Department does not explain how this connects to any actual or suspected criminal activity. The Department points out that the council member identified protection from ICE as one of the reasons why the Governor should

impose a moratorium. The Department does not, however, attempt to argue that, as a consequence of such a motive, the moratorium itself would have been illegal. Even if the moratorium somehow violated one of the cited federal statutes—a dubious proposition—advocacy, even of illegal conduct, is protected under the First Amendment. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). In any event, the moratorium was never enacted, so nothing legal or illegal resulted from it. Like the first justification, the second does not withstand scrutiny.

The other two justifications involve training and guidance from Hennepin and Ramsey Counties about how staff should interact with ICE agents and other immigration officials on county property. Hennepin County instructed staff that, when presented with a warrant, they should ask for a few minutes to contact someone in leadership. When an immigration agent demands to apprehend an individual, staff are not supposed to provide information or consent to entry, but instead escalate to a supervisor. Finally, if a federal agent threatens to use or uses force, staff are not to obstruct the agent. Abreu Decl. Exs. 1–3. Similarly, Ramsey County's guidance advises employees to immediately notify a supervisor; inform the ICE agent that they do not

-23-

have authority to grant access and do not consent to a search; leave the interpretation of legal documents to legal counsel; and not personally provide any data or document to the ICE agent, "regardless of warrant or subpoena." Schleicher 2d Decl. Ex. 1.

None of this is itself unlawful, nor does any of this encourage unlawful behavior. To begin with, the county policies have no connection to any possible violation of 18 U.S.C. § 111, which requires proof of the use of force—that is, "actual physical contact" or "a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death." *United States v. Street*, 66 F.3d 969, 977 (8th Cir. 1995) (quoting *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir.1993)). Hennepin County's training actually *forbade* employees from interfering with immigration agents, by force or otherwise.

With respect to potential violations of 8 U.S.C. § 1324 and 18 U.S.C. § 1505, a county violates no law when it directs that sensitive matters—such as a law-enforcement officer showing up on county property with a subpoena—should be handled by supervisors and legal counsel rather than by receptionists and other frontline employees. Moreover, it is extremely unlikely that a policy that explicitly instructed employees *not* to obstruct law-enforcement agents somehow resulted in obstruction. In any event, one would expect that, before launching a sweeping investigation into nearly the entire political structure of a sovereign state, the

-24-

Department would have identified at least one instance in which a county employee actually obstructed a law-enforcement officer after being told of his or her employer's policy. Yet the Department has been unable to identify a single such instance.

To be clear, the Court agrees with the Department that a grand-jury subpoena need not be supported by probable cause. At the same time, a grand-jury subpoena cannot be issued for an improper purpose. The fact that connections between the information sought in the subpoenas and any possible criminal violation range from extremely weak to nonexistent only adds to the overwhelming evidence that these subpoenas were not issued to investigate, but to harass, coerce, and retaliate.

In sum, because the Court finds that the dominant purpose of the challenged subpoenas is to coerce Minnesota officials into assisting the federal government with enforcing civil immigration law and to harass and retaliate against them for failing to do so, the Court grants the motions to quash.

## C. Unsealing

At the hearing on the motions to quash, the Court indicated its intent to unseal this matter and asked the parties to notify the Court of any objection. The moving parties—that is, the state and local officials and entities who are the supposed targets of the supposed investigation—say that they do not object to unsealing (except that they ask that four documents submitted as exhibits remain sealed). The Department

-25-

opposes unsealing.  It does not identify any specific concerns, but instead merely alludes to the general policies underlying the need for grand-jury secrecy.

This is a collateral matter, however, not a "matter occurring before the grand jury."  Fed. R. Crim. P. 6(e)(2)(B).  That said, materials in a collateral proceeding should nevertheless remain sealed to the extent that they could reveal a matter occurring before the grand jury.  *See* Fed. R. Crim. P. 6(e)(6) ("Records, orders, and subpoenas relating to grand-jury proceedings must be kept under seal to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury."); *United States v. McDougal*, 559 F.3d 837, 840 (8th Cir. 2009) ("'the secrecy of grand jury proceedings also extends to collateral proceedings,' which might reveal matters occurring before a grand jury" (quoting *In re Newark Morning Ledger Co.*, 260 F.3d 217, 222 (3d Cir. 2001))).

Ordinarily, proceedings and materials concerning a motion to quash a grand-jury subpoena would be highly likely to reveal grand-jury matters.  In this case, however, the existence of the grand-jury matter, as well as the existence of the subpoenas themselves, have already been publicly revealed[29]—most likely by the Department. Moreover, nothing in this order or in the materials submitted to the Court could possibly compromise a criminal investigation; as the Court has explained at length, the

---

[29]*Walz's office, 5 other MN government offices served subpoenas in ICE obstruction investigation*, Fox 9, Jan. 20, 2026, https://perma.cc/6ZWQ-VHUX.

Department is not *conducting* a criminal investigation, but is instead using the grand-jury process for other (unlawful) purposes. In addition, those on whom the subpoenas were served—as well as those who appear to be the targets of the Department's misuse of the grand-jury process—want this matter *disclosed*. Finally, the public has a very strong interest in learning of this abuse of the grand-jury process by the Department.

For these reasons, the Court intends to unseal this order and all materials filed in connection with this order (with the exception of the four exhibits identified below). *Cf. In re Grand Jury Subpoenas Dated Feb. 28, 2002, Mar. 26, 2003, Oct. 4, 2004*, 472 F.3d 990, 996 (8th Cir. 2007) (remanding for the district court to "assess the overall need for secrecy in this grand jury proceeding"). Before doing so, however, the Court will stay the unsealing of this *order* for a few days to give the Department the opportunity to challenge that unsealing in the court of appeals, if the Department wishes to do so. Moreover, the Court will stay the unsealing of the *briefs and exhibits* filed in this matter for a longer period of time to give the parties one final opportunity to identify any additional materials that should remain sealed or be redacted.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

-27-

1. The motions to quash Subpoena Nos. 2022R00519-A, 2022R00519-B, 2022R00519-C, 2022R00519-D, 2022R00519-E, and 2022R00519-F are GRANTED, and the subpoenas are QUASHED.

2. The Court ORDERS that a miscellaneous matter be opened and that this order be unsealed and docketed in that matter on Monday, June 22, at 10:00 am.

3. The Court ORDERS that Exhibit 1 attached to the second declaration of Steven Schleicher and Exhibits 1–3 attached to the declaration of Flavio de Abreu remain sealed.

4. As to the other materials filed in this matter:

   a. On or before July 1, 2026, any party may file, in the miscellaneous matter, a memorandum identifying additional documents that should remain sealed or proposing redactions to documents that otherwise may be unsealed. The memorandum must identify the documents or proposed redactions with specificity and provide a *specific* reason for continued sealing or redaction.

   b. On or before July 15, 2026, a party opposing any proposed continued sealing or proposed redactions may file a response.

c.     If no party files a memorandum in compliance with ¶ 4(a), the Court will direct that this entire matter be unsealed and publicly docketed in the miscellaneous matter save for the documents identified in ¶ 3 (which will be docketed under seal).

Dated: June 17, 2026

Patrick J. Schiltz, Chief Judge
United States District Court

-29-