# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

IN RE GRAND JURY SUBPOENA
No. 2022R00519-B

Case Number: _____

**\*\*FILED UNDER SEAL\*\***

## MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO QUASH GRAND JURY SUBPOENA

RECEIVED

FEB 02 2026

CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................................... 1

II. FACTUAL BACKGROUND ..................................................................................... 4

    A. The Trump Administration's Targeting of Minnesota and the Twin Cities ................................................................................................................ 4

    B. Response by the People of Minnesota and Their Elected Officials .............. 7

    C. The Administration's Efforts to Impose Its Will on Minnesota Leaders .................................................................................................................. 10

    D. The Leak of Grand Jury Matters ................................................................ 12

    E. The Grand Jury Subpoena ......................................................................... 14

III. LEGAL STANDARD ............................................................................................. 15

IV. ANALYSIS ............................................................................................................. 15

    A. Mayor Frey and the City Have Standing to Challenge the Subpoena ......... 16

    B. The Subpoena Was Issued in Bad Faith and for Improper Purposes and Therefore Should Be Quashed ............................................................... 19

        1. The Administration's own statements and surrounding context demonstrate that the subpoena was issued to retaliate against and harass Mayor Frey ........................................................ 19

        2. There is no legitimate law enforcement purpose for the subpoena. ........................................................................................... 24

        3. The subpoena was also issued for the improper purpose of coercing the Mayor and City to aid in federal immigration enforcement. ..................................................................................... 27

        4. Because it was issued in bad faith and for improper purposes, the subpoena must be quashed. ................................................... 32

    C. The Subpoena Is Unenforceable Under the First Amendment ................... 35

    D. The Administration's Apparent Rule 6(e) Violations Are Further Evidence of Irregularity and Bad Faith, and the Court Should Order the Government to Explain Itself at a Show Cause Hearing ....................... 40

V. CONCLUSION ....................................................................................................... 43

## I. INTRODUCTION

The grand jury subpoena challenged here is the latest in a series of efforts by the Trump Administration to target and retaliate against Mayor Jacob Frey, the City of Minneapolis, and other high-ranking Minnesota public officials. In recent days, Administration officials and the President himself have openly and expressly attacked Mayor Frey for voicing opposition to federal immigration enforcement tactics in Minneapolis, as well as for upholding City laws and policies that prohibit City participation in federal immigration enforcement. Mayor Frey's public speech has involved criticism of the federal government's unprecedented deployment of federal immigration agents, who have used excessive force, escalated tensions, and perpetrated violence in Minneapolis, resulting in the deaths of Minnesotans Renee Good and Alex Pretti.

Mayor Frey has been clear that he endorses only peaceful protest, and—far from calling for violence—he has emphasized that non-peaceful protesters will be held accountable. Yet Administration officials have falsely and publicly accused Mayor Frey of engaging in "terrorism," promised to stop him "by whatever means necessary," and made numerous other false accusations and threats against the Mayor and City of Minneapolis.

On January 20, Department of Justice officials issued a grand jury subpoena riddled with irregularities to the Mayor's Office and, reportedly, to the offices of Governor Walz, Attorney General Ellison, and other high-ranking Minnesota public officials who have voiced opposition to federal immigration enforcement efforts and upheld state or local policies disfavored by the Administration. They did so after informing news outlets that the Department of Justice was investigating the Mayor and Governor for purported

1

criminal activity and issuing grand jury subpoenas—an apparent violation of Federal Rule of Criminal Procedure 6(e) and its provisions concerning the secrecy of grand jury proceedings. Almost immediately after the subpoenas arrived, U.S. Attorney General Pam Bondi wrote a letter to Governor Walz in which she further attacked political speech by Mayor Frey and others opposing federal agents' excessive tactics. She demanded—as purported "common sense solutions" to the "problems" caused by the surge of federal immigration agents in Minneapolis—that the Governor repeal "sanctuary policies," provide access to the state's voter rolls, and share data concerning the state's Medicaid and Food and Nutrition programs.

If these actions were not enough to show that the purpose of the subpoena is not to investigate a federal crime but instead to retaliate against and coerce Mayor Frey, the City of Minneapolis, and other jurisdictions to change laws and policies disfavored by the Administration, the subpoena itself confirms it. Although the Department of Justice leaked the supposed existence of a criminal investigation of the Mayor and Governor, the subpoena is directed to their respective offices and the records requested suggest no connection to a federal crime. *See* Ex. A (Grand Jury Subpoena directed to Custodian of Records for the Office of the Mayor of Minneapolis). Instead, the subpoena demands the production of information pertaining to the City of Minneapolis' immigration-related policies and laws.

The Administration's actions are an abuse of the grand jury process and a misuse of criminal authorities to target perceived political adversaries. Grand juries may not, in the exercise of their broad investigatory powers, "select targets of investigation out of malice

2

or an intent to harass," *United States v. R. Enters., Inc.*, 498 U.S. 292, 299 (1991), nor may a prosecutor use the grand jury as a "private tool," *United States v. Calk*, 87 F.4th 164, 186 (2d Cir. 2023) (citation omitted). That is precisely what happened here.

The City of Minneapolis[1] and Jacob Frey[2] are therefore moving to quash the subpoena for multiple reasons. First and foremost, the subpoena is unreasonable and oppressive under Federal Rule of Criminal Procedure 17(c)(2) because it was issued to retaliate against and harass a perceived political adversary and to coerce state and local officials to enforce federal immigration laws. Second, the subpoena violates the First Amendment by impermissibly targeting and retaliating against Mayor Frey for political speech. In addition to quashing the subpoena, the Court should order a show cause hearing on the government's misuse of the grand jury and apparent violation of Federal Rule of Criminal Procedure 6(e).

Our Constitution and laws do not permit the President—or prosecutors acting under his direction—to weaponize the criminal justice system by misusing the grand jury to retaliate against and harass perceived political adversaries for their speech and performance

---

[1] The grand jury subpoena was directed to the "Custodian of Records for the Office of the Mayor of Minneapolis." The Office of the Mayor of Minneapolis is a part of, and not a legal entity separate from, the City of Minneapolis. *See* Minneapolis City Charter §§ 1.1, 1.2 (City of Minneapolis is municipal corporation); 1.4(a) (City may exercise any common law powers of municipal corporation); 7.1 (Mayor is chief executive officer of City). Accordingly, this motion is made by the City of Minneapolis on behalf of the Office of the Mayor, one of the City's constituent parts.

[2] Jacob Frey is moving to quash this subpoena in his personal capacity. He has standing to do so for the reasons discussed in Section IV.A, *infra*.

of their duties. The subpoena breaches these bedrock principles and should be promptly quashed.

## II. FACTUAL BACKGROUND

### A. The Trump Administration's Targeting of Minnesota and the Twin Cities

For months, the Administration has sought to force state and local governments to bend to its will on matters of immigration enforcement. Elected officials including Mayor Frey and Governor Walz have refused to capitulate and have continued to adhere to state and local laws, such as Minneapolis' laws and policies prohibiting the City from participating in federal immigration enforcement.

The Administration's campaign of coercion is proceeding on multiple fronts, including public threats, executive orders, administrative reviews, affirmative litigation, the deployment of an armed and militarized federal force, and now this subpoena and leaked criminal investigation. Since the first month of the Administration, the White House has threatened to revoke federal funding to jurisdictions with so-called "sanctuary" policies limiting the role that their personnel or programs play in federal immigration enforcement. The President subsequently issued executive orders following through on these threats,[3] which Minneapolis and other plaintiffs challenged in court. *See, e.g.*, *City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025); *City & County of San*

---

[3] Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025); Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 19, 2025); Exec Order No. 14,287, 90 Fed. Reg. 18761 (Apr. 28, 2025).

*Francisco v. Trump*, 782 F. Supp. 3d 830 (N.D. Cal. 2025).[4] In September 2025, the United States sued the City of Minneapolis and other state and local defendants, accusing them of being "sanctuary jurisdictions" and seeking to invalidate various provisions of Minneapolis' Separation Ordinance,[5] Minnesota law, and other local and county ordinances. Complaint, *United States v. Minnesota*, No. 25 Civ. 3798 (D. Minn. Sep. 29, 2025), ECF No. 1.

In the midst of these events, Mayor Frey stated "Minneapolis will not back down. . . . We won't be bullied. We won't cave. Minneapolis will always stand with our neighbors over Trump's politics of fear."[6] He has continued to speak out and execute his mayoral duties, which include serving as the City's chief spokesperson, representing the City in intergovernmental dealings (including dealings with the federal government), and promoting and developing the prosperity and social well-being of the people of Minneapolis. *See* Minneapolis City Charter §§ 7.1(a), 7.1(c)(4); Minneapolis Code of Ordinances ("MCO") §§ 11.10, 11.20(7).

---

[4] President Trump has continued to make similar statements in recent weeks. *See* Joel Rose, *Trump Is Threatening to Cut Funding from Sanctuary Cities. Here's What to Know*, NPR (Jan. 17, 2026), https://www.npr.org/2026/01/17/nx-s1-5679562/trump-sanctuary-cities-ice-immigration.

[5] The Separation Ordinance was amended in December 2025 and has not yet been codified. *See* Minneapolis, Minn., Ordinance 2025-060 (Dec. 20, 2025), https://lims.minneapolismn.gov/Download/MetaData/42174/2025-060_Id_42174.pdf; *see also* Minneapolis Code of Ordinances, tit. 2, ch. 19 (Employee Authority in Immigration Matters), https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=COOR_TIT2AD_CH19EMAUIMMA_19.10PUPOST (prior version of Separation Ordinance).

[6] *Mayor Frey's Statement and City Response to Federal Lawsuit*, Minneapolismn.gov (Oct. 2, 2025), https://www.minneapolismn.gov/news/2025/october/fed-lawsuit.

In early December, the Administration dramatically escalated its campaign against the City with Operation Metro Surge, a deployment of approximately 3,000 federal agents that DHS has called "the largest immigration enforcement operation ever carried out."[7] The Administration targeted Minnesota despite the state's small population of immigrants relative to other jurisdictions. Undocumented immigrants represent just over 1.5% of Minnesota's population, less than half the national average of 3.3%.[8]

Since the beginning of this deployment, federal agents in Minnesota have engaged in aggressive and unlawful conduct, including beating and shooting residents, intimidating protesters and observers, targeting individuals based on race or ethnicity, and arresting and detaining U.S. citizens and children.[9] In January, federal agents with Operation Metro Surge killed two Minneapolis residents—Renee Good and Alex Pretti—in the span of less

---

[7] Rebecca Santana & Mike Balsamo, *Homeland Security Plans 2,000 Officers in Minnesota for Its 'Largest Immigration Operation Ever,'* Associated Press (Jan. 6, 2026), https://apnews.com/article/immigration-enforcement-ice-noem-minnesota-somali-db661df6de1131a034da2bda4bb3d817; Jeff Hargarten & Jake Steinberg, *Homeland Security Presence in Minnesota Dwarfs Twin Cities' Largest Police Forces*, Minn. Star Trib. (Jan. 13, 2026), https://www.startribune.com/how-ice-numbers-compare-to-twin-cities-largest-police forces/601562617.

[8] Cameron Macht, *The Role of Undocumented Immigrants in Minnesota's Workforce*, Minn. Dep't of Emp. & Econ. Dev. (Mar. 2025), https://mn.gov/deed/newscenter/publications/trends/mar-2025/immigrants.jsp.

[9] *See, e.g.*, Complaint ¶¶ 69-90, *Minnesota v. Noem*, No. 26 Civ. 190 (D. Minn. Jan. 12. 2026), ECF No. 1; Maia Coleman, *ICE Arrest of a Citizen, Barely Dressed, Sows Fear in Twin Cities*, N.Y. Times (Jan. 20, 2026), https://www.nytimes.com/2026/01/20/us/chongly-scott-thao-ice-arrest.html; Priscilla Alvarez, Chris Boyette & Amanda Musa, *5-Year-Old Boy Taken by ICE in Minneapolis Area Being Held with Father at Texas Facility*, CNN (Jan. 23, 2026), https://www.cnn.com/2026/01/22/us/minnesota-liam-conejo-ramos-ice-detained; Matt Sepic, *ICE Agents Tackle, Arrest American Citizen in Minneapolis*, MPR News (Dec. 12, 2025), https://www.mprnews.org/story/2025/12/10/ice-agents-tackle-arrest-american-citizen-in-minneapolis.

than three weeks.[10] Federal agents have in many instances acted in violation of federal court orders. As Chief Judge Schiltz recently wrote in an order cataloguing 96 such violations by ICE: "The extent of ICE's noncompliance is almost certainly substantially understated. . . . This list should give pause to anyone—no matter his or her political beliefs—who cares about the rule of law. ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence." *Juan T.R. v. Noem*, No. 26 Civ. 107, 2026 WL 232015, at *1 (D. Minn. Jan. 28, 2026).

## B. Response by the People of Minnesota and Their Elected Officials

The means that the Administration has used to carry out Operation Metro Surge have, foreseeably, provoked a widespread response in the Twin Cities and across the nation. In Minneapolis, residents have turned out in large numbers to protest, observe, document, and film the conduct of federal agents—constitutionally-protected activity. Others have joined community-led efforts to support their neighbors who are being targeted. And still others are participating in lawsuits as plaintiffs, detailing their interactions with federal agents and alleging the violation of their rights. *See, e.g.,* Complaint, *Tincher v. Noem*, No. 25 Civ. 4669 (D. Minn. Dec. 17, 2025), ECF No. 1; Complaint, *Hussen v. Noem*, No. 26 Civ. 324 (D. Minn. Jan. 15, 2026), ECF No. 2; Exhibits to Declaration of Lindsey Middlecamp, *Minnesota v. Noem*, No. 26 Civ. 190 (D.

---

[10] Cheryl W. Thompson, *Man Shot Dead by Federal Immigration Officers in Minneapolis*, NPR (Jan. 24, 2026), https://www.npr.org/2026/01/24/nx-s1-5687276/man-shot-dead-minneapolis.

Minn. Jan. 22, 2026), ECF Nos. 88-89 (declarations from dozens of Twin Cities residents attesting to such violations).

For his part, Mayor Frey has continued to represent his constituents, including by speaking out on their behalf. In particular, he has repeatedly called for an end to Operation Metro Surge, highlighting the public safety crisis it has created. In late December, Mayor Frey noted that although Minneapolis had seen a significant drop in crime in 2025,[11] federal operations were jeopardizing the work that helped enable that decline.[12] He warned that he was "increasingly concerned because of the chaos that is being caused by the ICE agents that somebody is gonna get seriously injured or killed."[13] On January 7, at a press conference hours after an ICE agent killed Renee Good, Mayor Frey said: "ICE – Get the fuck out of Minneapolis. We do not want you here. Your stated purpose for being in this City is to create some kind of safety, but you are doing exactly the opposite."[14] And, again, on January 15, Mayor Frey said in a social media post: "Minnesota needs ICE to leave, not an escalation that brings additional federal troops beyond the 3,000 already here. My

---

[11] In 2025, Minneapolis achieved decreases in crime across the board: Homicides dropped 16%, burglaries dropped 10%, and carjackings dropped 73%. Nick Halter, *Homicide and Other Crime Falls in St. Paul and Minneapolis in 2025*, Axios (Jan. 12, 2026), https://www.axios.com/local/twin-cities/2026/01/12/homides-fall-sharply-saint-paul-minneapolis; Jeff Wald, *MPD Chief Brian O'Hara on 2025 Crime: 'Our City Is Becoming Safer Every Day,'* Fox 9 KMSP (Jan. 6, 2026), https://www.fox9.com/news/mpd-chief-2025-crime-report-jan-2026.

[12] *'It's Putting People at Risk': Walz, Twin Cities Leaders Denounce ICE Immigration Operations*, KSTP (Dec. 24, 2025), https://kstp.com/kstp-news/top-news/walz-twin-cities-leaders-to-talk-ice-immigration-operations.

[13] *Id.*

[14] *Minneapolis Responds to Fatal Shooting of Woman by Federal Agent*, Minneapolismn.gov (Jan. 7, 2026), https://www.minneapolismn.gov/news/2026/january/fatal-shooting-response.

priority is keeping local law enforcement focused on public safety, not diverted by federal overreach."[15]

At the same time, Mayor Frey has been clear that he endorses only peaceful protest, and he has emphatically rejected meeting violence with violence. In a January 18 interview, he explained:

> And part of my responsibility as mayor is to channel what people in our city are feeling. And the people in our city were angry. They were upset. And at the same time, from the very beginning, we were saying the same thing, which is, we've got to keep the peace. We're not going to counter Donald Trump's chaos with our own brand of chaos [] here. Yes, we stand up. Yes, we peacefully protest. And we're not going to go down this route that gives them the excuse to come in with greater numbers. They're looking for an excuse. They're trying to intimidate Minneapolis residents. But I'll tell you, I've seen tens of thousands of people remain composed, to line up to get groceries to people that are scared to go outside, to make sure that people have a walk to their car on their way back home from work.[16]

In other statements, Mayor Frey has made clear that non-peaceful protesters will be arrested and held accountable—and, in fact, arrests have been carried out.[17]

---

[15] Sarah Fortinsky, *Walz to Trump After Threat of Troops: 'Let's Turn the Temperature Down,'* Hill (Jan. 15, 2026), https://thehill.com/homenews/state-watch/5691004-minnesota-gov-appeals-trump.

[16] *'This Week' Transcript 1-18-26: Minneapolis Mayor Jacob Frey*, MSN (Jan. 18, 2026), https://www.msn.com/en-us/news/politics/this-week-transcript-1-18-26-minneapolis-mayor-jacob-frey/ar-AA1Us5vN?ocid.

[17] *See, e.g.*, David Griswold, *'I'm Calling for Peace' Minneapolis Mayor Jacob Frey Responds to Protests After Man Shot in the Leg by Federal Officer*, KARE 11 (Jan. 14, 2026), https://www.kare11.com/article/news/local/ice-in-minnesota/minneapolis-mayor-jacob-frey-continues-demand-ice-leave-city/89-2df94987-25bb-4aaa-bf3c-608cf64863c6 (Mayor Frey: "I'm calling for peace. . . . Everybody has a role in achieving that peace, and we're going to try and do everything we can to keep it. . . . [F]or anyone that is taking the bait tonight, stop. That is not helpful. . . . You are not helping the undocumented immigrants in our city. You are not helping the people that call this place home."); Ana Faguy, *Thousands March and Dozens Arrested in Minneapolis Protests Against ICE*, BBC (Jan. 11, 2026), https://www.bbc.com/news/articles/cvgpnwnqygro (city officials stating that 30 people had been arrested during Minneapolis protests in early January).

Mayor Frey and the City of Minneapolis have also taken concrete steps to protect Minneapolis residents by seeking relief in court. In mid-January, the City of Minneapolis (along with State of Minnesota and the City of St. Paul) sued federal government defendants in connection with Operation Metro Surge, seeking to end that operation and require agents who lawfully remain to cease their unlawful conduct. Complaint, *Minnesota v. Noem*, No. 26 Civ. 190 (D. Minn. Jan. 12, 2026), ECF No. 1. The Court there denied preliminary relief, but it made clear in doing so that it was not ruling on the merits, and the case remains pending. *Minnesota v. Noem*, No. 26 Civ. 190, slip op. at 2 (D. Minn. Jan. 31, 2026), ECF No. 135.

## C.    The Administration's Efforts to Impose Its Will on Minnesota Leaders

Administration officials have openly expressed their intent to retaliate against Mayor Frey, Governor Walz, and other Minnesota leaders. In the days preceding service of the grand jury subpoena on January 20, the President and his aides issued statements criticizing Mayor Frey and Governor Walz based on their speech and falsely accusing them of inciting violence and protecting criminals. For example:

- On January 12, 2026, the official DHS account on X blamed Mayor Frey and Governor Walz for the federal government's decision to undertake Operation Metro Surge, saying: "DHS law enforcement has surged to Minneapolis because @GovTimWalz, @MayorFrey and the city's sanctuary politicians have REFUSED to keep American citizens safe. Sanctuary politicians need to work with us, not against us, to make sure that law enforcement officers and citizens alike are kept safe."[18]

- On January 15, DHS Secretary Kristi Noem posted that "Mayor Frey and Governor Walz have to get their city under control. They are encouraging

---

[18] Homeland Security (@DHSgov), X (Jan. 12, 2026, at 9:25 PM), https://x.com/DHSgov/status/2010900986798199210?s=20.

impeding and assault against our law enforcement which is a federal crime, a felony."[19]

- On January 16, the White House posted an article on its official website entitled "Minnesota's 'Sanctuary' Defiance Has Consequences."[20] The article opined that "Minnesota's 'leaders' have chosen defiance over partnership" and singled out Mayor Frey for stating that Minneapolis would not cooperate with ICE.[21]

- On January 19, DHS Secretary Noem stated that "Tim Walz and Jacob Frey refuse to protect their own people and instead protect criminals."[22]

These statements have included explicit threats of criminal prosecution and even deployment of the military through an invocation of the Insurrection Act. Most notably:

- On January 13, President Trump claimed that "Minnesota Democrats love the unrest," adding, "FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!"[23]

- On January 14, Deputy Attorney General Todd Blanche warned: "Walz and Frey - I'm focused on stopping YOU from your terrorism by whatever means necessary. This is not a threat. It's a promise."[24]

- On January 15, the President threatened: "If the corrupt politicians of Minnesota don't obey the law and stop the professional agitators and insurrectionists from

---

[19] Secretary Kristi Noem (@Sec_Noem), X (Jan. 15, 2026, at 11:21 AM), https://x.com/Sec_Noem/status/2011836220108607536?s=20.

[20] *Minnesota's 'Sanctuary' Defiance Has Consequences*, The White House (Jan. 16, 2026), https://www.whitehouse.gov/articles/2026/01/minnesotas-sanctuary-defiance-has-consequences.

[21] *Id.*

[22] Immigr. & Customs Enf't, *ICE Continues to Remove the Worst of the Worst from Minneapolis Streets as DHS Law Enforcement Marks 3,000 Arrests During Operation Metro Surge*, U.S. Dep't of Homeland Sec. (Jan. 19, 2026), https://www.dhs.gov/news/2026/01/19/ice-continues-remove-worst-worst-minneapolis-streets-dhs-law-enforcement-marks-3000.

[23] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 13, 2026, at 8:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.

[24] Todd Blanche (@DAGToddBlanche), X (Jan. 14, 2026, at 9:03 PM), https://x.com/DAGToddBlanche/status/2011620198751597028.

attacking the Patriots of I.C.E., who are only trying to do their job, I will institute the INSURRECTION ACT."[25]

- On January 24, Attorney General Bondi proclaimed: "The full weight of federal law enforcement is engaged in Minnesota and the Department of Justice is advancing action on every front. . . . Accountability is coming."[26]

Administration officials have made clear that by attacking Mayor Frey and Governor Walz and surging federal law enforcement agents to Minnesota, they seek to pressure them to yield to the Administration's preferred immigration enforcement policies. On January 24, Attorney General Bondi sent a letter to Governor Walz demanding that Minnesota change its "sanctuary" policies, hand over its voter rolls, and share other sensitive data in exchange for "end[ing] the chaos in Minnesota."[27]

### D. The Leak of Grand Jury Matters

The Administration followed through on its threats and issued grand jury subpoenas to the Offices of Mayor Frey and others. Grand jury matters are confidential, and attorneys for the government are strictly prohibited from disclosing them. *See* Fed. R. Crim. P. 6(e).[28] Here, it appears that Administration officials leaked this grand jury information to the media in violation of that rule.

---

[25] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 15, 2026, at 8:04 AM), https://truthsocial.com/@realDonaldTrump/posts/115899252938886431.

[26] Attorney General Pamela Bondi (@AGPamBondi), X (Jan. 24, 2026, at 9:07 PM), https://x.com/AGPamBondi/status/2015245175644168618?s=20. "U.S. officials" leaked the investigation and grand jury subpoenas to the public days before the subpoena was served on Governor Walz. *See infra* Section II.D.

[27] Letter from Pamela Bondi, U.S. Att'y Gen., to Tim Walz, Gov. of Minn. (Jan. 24, 2026), https://www.nytimes.com/interactive/2026/01/24/us/pam-bondi-walz-doc.html.

[28] Consistent with the secrecy provisions of Rule 6(e), this motion and all related pleadings have been filed in person and under seal.

On January 16, four days before service of the subpoenas, media outlets announced that the Justice Department had opened a criminal investigation into Minnesota's state and local officials.[29] The stories specifically named Mayor Frey and Governor Walz as among the investigation's targets. They described the "crime" being investigated as 18 U.S.C. § 372, which prohibits conspiracies to impede a federal officer. And they reported that the Justice Department was preparing to issue grand jury subpoenas targeting Mayor Frey and Governor Walz.[30]

Some of the articles directly attributed these revelations to unspecified federal "officials," including a "senior law enforcement official."[31] Others did so implicitly, citing "people familiar with the matter" who maintained anonymity "because they were not authorized to discuss a pending investigation."[32] Of course, there is no one *other* than a federal law enforcement official who could have possessed that knowledge. At the time of

---

[29] Camilo Montoya-Galvez, Jennifer Jacobs & Sarah N. Lynch, *DOJ Investigating Gov. Tim Walz, Minneapolis Mayor Jacob Frey over Alleged Conspiracy to Impede Immigration Agents*, CBS News (Jan. 16, 2026), https://www.cbsnews.com/news/justice-department-investigating-tim-walz-jacob-frey-minnesota.

[30] *See, e.g., id.*

[31] Jana Winter & Andrew Goudsward, *US Justice Department Probing Minnesota Governor Walz, Other Officials, Source Says*, Reuters (Jan. 17, 2026), https://www.reuters.com/world/us/doj-probing-minnesota-officials-over-alleged-conspiracy-impede-immigration-2026-01-16; Perry Stein, *Justice Dept. Launches Criminal Investigation of Minnesota Governor*, Wash. Post (Jan. 16, 2026), https://www.washingtonpost.com/national-security/2026/01/16/trump-minnesota-walz-frey-criminal-investigation; Glenn Thrush et al., *Trump Administration Begins Criminal Inquiry Into Minnesota Leaders*, N.Y. Times (Jan. 16, 2026), https://www.nytimes.com/2026/01/16/us/politics/tim-walz-jacob-frey-investigation-trump.html.

[32] *See, e.g.*, Alanna Durkin Richer, Eric Tucker & Jack Brook, *Justice Department Investigating Whether Minnesota's Walz and Frey Impeded Immigration Enforcement*, AP News (Jan. 18, 2026), https://apnews.com/article/minnesota-immigration-crackdown-25e46910fcc62fbf5ab341905af9891c.

the initial reporting, Mayor Frey and his Office had not received any subpoena, nor had they been notified by any federal official about any upcoming subpoena. About an hour after the first report emerged, Attorney General Bondi posted on X: "A reminder to all those in Minnesota: No one is above the law."[33]

### E.    The Grand Jury Subpoena

On January 20, the Mayor's Office received the subpoena. The subpoena is directed to the "Custodian of Records for the Office of the Mayor of Minneapolis," and it purports to require live testimony at the federal courthouse in Minneapolis on February 3. It also directs the Custodian of Records to "bring . . . to the Grand Jury" eight categories of documents relating to municipal immigration policy and enforcement.

As explained in more detail below, the subpoena contains numerous irregularities, including that it was issued in the name of the politically appointed U.S. Attorney—who reports directly to Deputy Attorney General Blanche—rather than a career line prosecutor; does not identify any assigned Assistant U.S. Attorney; does not identify any assigned federal law enforcement agent; and does not provide a mechanism for the custodian of records to produce documents in lieu of appearing in person, the ordinary practice.

Following the subpoena's issuance and associated reporting, other media reports indicated that career prosecutors in the U.S. Attorney's Office in Minneapolis confronted the office's political leadership with concerns "that they were being asked to execute orders that went against the department's mission and best practices," and that "[s]ome of the

---

[33] Attorney General Pamela Bondi (@AGPamBondi), X (Jan. 16, 2026, at 7:53 PM), https://x.com/AGPamBondi/status/2012327355327340947.

prosecutors . . . were considering resigning in protest."[34] This news came just two weeks after six career prosecutors in the U.S. Attorney's Office—including the Office's second-in-command, Joseph Thompson—resigned over pressure from senior DOJ officials to investigate the partner of Renee Good, who was killed by an ICE agent six days before.[35]

## III.   LEGAL STANDARD

A district court may "quash or modify" a grand jury "subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2); *R. Enters.*, 498 U.S. at 299 (analyzing grand jury subpoena under Fed. R. Crim. P. 17(c)). Although "a grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing unreasonableness" is on the "recipient who seeks to avoid compliance," *R. Enters.*, 498 U.S. at 301, "[t]he investigatory powers of the grand jury are . . . not unlimited," *id.* at 299; *see also In re Grand Jury Subpoena Dated Aug. 14, 2019*, 964 F.3d 768, 771 (8th Cir. 2020). "Grand juries are not licensed to engage in arbitrary fishing expeditions, nor may they select targets of investigation out of malice or an intent to harass." *R. Enters.*, 498 U.S. at 299.

## IV.   ANALYSIS

The Court should promptly quash the grand jury subpoena to the Mayor's Office as unreasonable and oppressive because the surrounding facts and context demonstrate that it

---

[34] Alan Feuer & Glenn Thrush, *Justice Dept. Playbook in Minnesota: Investigate Foes, Protect Allies*, N.Y. Times (Jan. 29, 2026), https://www.nytimes.com/2026/01/29/us/politics/minnesota-justice-department-trump-ice.html.

[35] Ernesto Londoño, *Six Prosecutors Quit over Push to Investigate ICE Shooting Victim's Widow*, N.Y. Times (Jan. 13, 2026), https://www.nytimes.com/2026/01/13/us/prosecutors-doj-resignation-ice-shooting.html.

was issued "out of malice" and "an intent to harass." *Id.* As the Administration's own statements reflect, the subpoena is not an ordinary investigative step tied to a legitimate criminal investigation. Rather, it is merely another front in the federal government's campaign to intimidate and retaliate against Mayor Frey and other Minnesota officials for faithfully serving their constituents and following Minneapolis and Minnesota law. Both the City of Minneapolis on behalf of the Mayor's Office (the subpoena recipient) and Jacob Frey (the duly elected Mayor and named target of many of the Administration's attacks) have standing to challenge the subpoena.

Multiple reasons support the requested relief. First, the subpoena was issued in bad faith and for improper purposes, including to harass a perceived political adversary and coerce state and local officials to assist in federal immigration actions. Second, the subpoena runs afoul of the First Amendment by impermissibly targeting and retaliating against the Mayor for adhering to local policies and engaging in political speech. In addition to quashing the subpoena, the Court should order a show cause hearing on the government's apparent violation of Federal Rule of Criminal Procedure 6(e).

A.      **Mayor Frey and the City Have Standing to Challenge the Subpoena**

The City of Minneapolis and Jacob Frey move jointly to quash this grand jury subpoena directed to the Custodian of Records for the Office of the Mayor of Minneapolis. The City of Minneapolis has standing because the subpoena is directed to an office within the City—the Office of the Mayor; the Office of the Mayor is not its own legal entity. *See supra* note 1. Mayor Frey has standing to join in this motion because the subpoena infringes on his interests both as an individual and officeholder. *United States v. Raineri*, 670 F.2d

16

702, 712 (7th Cir. 1982) ("A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests."); *cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020) (recognizing "close connection between the Office" of an executive "and its occupant" in the context of a subpoena for documents).

Under Minneapolis' City Charter and Code of Ordinances, Mayor Frey has a legal interest in the records subject to the subpoena that confers standing to support this motion. As Mayor, he is the "chief executive officer . . . in whom the City's general executive and administrative authority resides." *See* Minneapolis City Charter § 7.1(a). The Code of Ordinances further provides that the Mayor is "the chief spokesperson and official representative of the city in all its affairs" and is "responsible for the proper and efficient administration of all affairs of the city." *See* MCO §§ 11.10, 11.20. Among the many duties explicitly delegated to the Mayor is the "power to inspect the books, papers, and records of all departments, boards, commissions, and other agencies as may be necessary for the proper discharge of the duties and responsibilities imposed upon" him. MCO § 11.20(3). And the Mayor leads the Office of the Mayor, which exists "to provide assistance to and support for the mayor in the performance of official functions and duties." MCO § 11.50. Mayor Frey's official responsibilities for "all affairs" of the City and his specific authority over its records and the Office of the Mayor establish "legally-cognizable interests" in the records sufficient to support his standing to challenge the subpoena. *See In re Grand Jury*, 111 F.3d 1066, 1073 (3d Cir. 1997) (recognizing that "sufficiently important, legally-cognizable interests in the materials" may confer standing); *see also Schwimmer v. United States*, 232 F.2d 855, 860 (8th Cir. 1956) (holding owner with constructive

17

possession was entitled to move to quash subpoena issued to third-party custodian possessing records).

Mayor Frey also has standing to protect his rights against the Administration's abuse of the grand jury process. Third party standing to assert claims of grand jury abuse is determined by "examining the nature of the abuse, and asking whether, and in what manner, it impinges upon the legitimate interests of the party allegedly abused." *In re Grand Jury (Schmidt)*, 619 F.2d 1022, 1026-27 (3d Cir. 1980). A third party has standing to challenge a grand jury subpoena where, as here, the claim is that "the grand jury is not investigating violations of federal law, and that the [prosecutors are] attempting to harass" the third party. *Id.* at 1027; *see also In re Grand Jury Proc.*, 814 F.2d 61, 67 (1st Cir. 1987) (finding standing where movant alleged "ongoing and widespread" Rule 6(e) violations and grand jury was "being used for an improper purpose").

Mayor Frey has standing because his rights as an individual are similarly at stake. He seeks to quash the subpoena because it is not part of a legitimate criminal investigation but rather an effort to harass and retaliate against him. The Administration's own leaks make clear that he is being targeted personally: The leaked information describes a supposed criminal investigation of the Mayor and a grand jury subpoena issued to him. Now that the subpoena has arrived, the Department of Justice cannot legitimately assert that Mayor Frey lacks an interest sufficient to challenge it simply because it was addressed to his Office. As precedent makes clear, the target of an abusive grand jury process may challenge a grand jury subpoena even as a third party. *See Schmidt*, 619 F.2d at 1027.

**B.     The Subpoena Was Issued in Bad Faith and for Improper Purposes and Therefore Should Be Quashed**

First and foremost, the Court should quash the subpoena because it is plainly rooted in malice and an intent to harass. *R. Enters.*, 498 U.S. at 299. The grand jury process serves a critical role in our criminal justice system, protecting the "innocent against hasty, malicious and oppressive persecution" and "determin[ing] whether a charge is founded upon reason or was dictated by . . . malice and personal ill will." *Wood v. Georgia*, 370 U.S. 375, 390 (1962). Prosecutors exercise special control over the grand jury, and they may not abuse the process to punish political opponents, *Wayte v. United States*, 470 U.S. 598, 608 (1985), or to "retaliate" against them for their "official acts," *Trump v. Vance*, 591 U.S. 786, 810 (2020). Here, the evidence of bad faith is unmistakable, and the Court should grant the motion to quash.

**1.     The Administration's own statements and surrounding context demonstrate that the subpoena was issued to retaliate against and harass Mayor Frey.**

The Court need look no further than the statements of top Administration officials—and, indeed, the President himself—to conclude that Mayor Frey was improperly targeted "out of malice or an intent to harass." *R. Enters.*, 498 U.S. at 299. Were there any doubt about the improper motives underlying the subpoena, the context surrounding its issuance puts that doubt to rest. Coming on the heels of strong public statements by Mayor Frey condemning the Administration's immigration enforcement tactics and a lawsuit filed by the City challenging Operation Metro Surge, "[t]he timing of the subpoena casts significant light on its purposes." *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985*

*(Simels)*, 767 F.2d 26, 29 (2d Cir. 1985); *see also Trump v. Vance*, 480 F. Supp. 3d 460, 486 (S.D.N.Y. 2020); *United States v. Perry*, 857 F.2d 1346, 1348 (9th Cir. 1988) (finding that "the timing and circumstances surrounding the issuance of" a subpoena "strongly suggest[ed] an improper motive").

As described in more detail above, *supra* Section II.C, the Administration, through the words of its own officials, has made clear that the subpoena is part of its campaign to pressure Minnesota public officials into yielding to its preferred immigration enforcement policies and to harass and retaliate against Minnesota's public officials when they refuse to fall in line. In response to rising tensions resulting from Operation Metro Surge, Minnesota's leaders spoke out forcefully on behalf of their constituents. *See supra* Section II.B. As federal immigration agents' actions impacted the daily life of his constituents, Mayor Frey repeatedly criticized the Administration's actions and called for the operation to end.[36] And on January 12, 2026, Minnesota and the cities of Minneapolis and St. Paul challenged the lawfulness of Operation Metro Surge in federal court, seeking an end to the operation and a court order that federal agents cease their unlawful conduct. Complaint at 76-78, *Minnesota v. Noem*, No. 26 Civ. 190 (D. Minn. Jan. 12, 2026), ECF No. 1.

---

[36] *See, e.g.*, City of Minneapolis, *Weekly Update from Mayor Frey - December 19: Minneapolis Stands with Our Immigrant Neighbors* (Dec. 19, 2025), https://content.govdelivery.com/bulletins/gd/MPLS-4004fc6?wgt_ref=MPLS_WIDGET_27; Mayor Jacob Frey (@MayorFrey), X (Dec. 23, 2025, at 5:16 PM), https://x.com/MayorFrey/status/2003590557478908335; Jacob Frey, *I'm the Mayor of Minneapolis. Trump Is Lying to You.*, N.Y. Times (Jan. 8, 2026), https://www.nytimes.com/2026/01/08/opinion/minneapolis-ice-agent-shooting-trump.html.

The Administration responded swiftly to these actions by stating publicly that it intended to retaliate against and punish Mayor Frey and other public officials for voicing opposition to the Administration's immigration enforcement operation. The day after *Minnesota v. Noem* was filed, President Trump announced as much on Truth Social: "FEAR NOT, GREAT PEOPLE OF MINNESOTA, THE DAY OF RECKONING & RETRIBUTION IS COMING!"[37] The following day, on January 14, Deputy Attorney General Todd Blanche confirmed the Administration's plan for retribution: "Minnesota insurrection is a direct result of a FAILED governor and a TERRIBLE mayor encouraging violence against law enforcement. It's disgusting. Walz and Frey - I'm focused on stopping YOU from your terrorism by whatever means necessary. This is not a threat. It's a promise."[38] Two days later, on January 16, Administration officials posted a statement on the official White House website promising "[c]onsequences" for "Minnesota's 'Sanctuary' Defiance."[39] These consequences, the statement explained, would be a result of "Minnesota's 'leaders' [choosing] defiance over partnership," pointing to a host of public statements by state and local officials in Minnesota, including Mayor Frey.[40] At no point in this sequence of events did the Administration attempt to hide the ball: To the contrary, it openly and repeatedly broadcasted its plan to punish Mayor Frey and other

---

[37] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 13, 2026, at 8:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.

[38] Todd Blanche (@DAGToddBlanche), X (Jan. 14, 2026, at 9:03 PM), https://x.com/DAGToddBlanche/status/2011620198751597028.

[39] The White House, *supra* note 20.

[40] *Id.*

officials in Minnesota for publicly opposing the Administration's immigration enforcement operation.

The same day as the White House website promised "[c]onsequences,"[41] media outlets began reporting that the Justice Department was preparing to issue grand jury subpoenas to Mayor Frey and Governor Walz[42]—a stark deviation from regular order, where grand jury investigations are conducted secretly, without public identification of subjects or targets. The grand jury subpoena was served on the Office of the Mayor four days later, on January 20, 2026. *See* Ex. A at 1.

These facts provide direct evidence of an "abuse of the grand jury process." *Calk*, 87 F.4th at 186. The express statements by the President and Department of Justice leadership, as well as the timing and broader context of the subpoena, clearly demonstrate that the subpoena was issued "out of malice" and with "an intent to harass" Mayor Frey. *R. Enters.*, 498 U.S. at 299. Because their intent is openly stated, there is no need here to rely on inference. In any event, any inference to be drawn from the timing and circumstances surrounding the subpoena reinforces the Administration's improper intent to use the grand jury for retributive ends. *See United States v. Fisher*, 455 F.2d 1101, 1105 (2d Cir. 1972) ("[T]he grand jury is not meant to be the private tool of a prosecutor.").

This is not the only instance in which the Administration has misused the criminal justice system to retaliate against and harass individuals who have opposed President

---

[41] *Id.*

[42] *See, e.g.*, Stein, *supra* note 31; Montoya-Galvez et al., *supra* note 29.

Trump and his policies. In a September 2025 social media post directed to Attorney General Bondi, President Trump wrote that former FBI Director James Comey and current New York Attorney General Letitia James are "guilty as hell" and that "JUSTICE MUST BE SERVED, NOW!!!"[43] Within a month, the Department of Justice secured indictments of both Comey and James, following reports that career prosecutors had concluded that the evidence did not support those charges and had resigned or were fired.[44] Courts have since dismissed those indictments,[45] but news reports indicate that the Department is continuing to pursue these cases and potentially others.[46] Mayor Frey, Governor Walz, and other Minnesota officials are just one group of a growing list of public officials the Administration is targeting through improper use of the criminal justice system.

---

[43] Donald J. Trump (@realDonaldTrump), Truth Social (Sep. 20, 2025, at 6:44 PM), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727.

[44] *See* Salvador Rizzo, Perry Stein & Jeremy Roebuck, *Top Virginia Prosecutor Resigns Amid Criticism over Letitia James Investigation*, Wash. Post (Sep. 20, 2025), https://www.washingtonpost.com/national-security/2025/09/19/trump-letitia-james-erik-siebert-virginia; Salvador Rizzo, *Firings and Resignations Roil U.S. Attorney's Office Prosecuting Comey*, Wash. Post (Oct. 2, 2025), https://www.washingtonpost.com/national-security/2025/10/02/edva-firings-resignations-comey.

[45] *See* Dareh Gregorian, Gary Grumbach & Ryan J. Reilly, *Judge Dismisses Cases Against James Comey and Letitia James After Finding Prosecutor Was Unlawfully Appointed*, NBC News (Nov. 24, 2025), https://www.nbcnews.com/politics/justice-department/judge-dismisses-cases-james-comey-letitia-james-finding-prosecutor-was-rcna244775.

[46] *See* Devlin Barrett & Jonah E. Bromwich, *Justice Dept. Will Appeal Dismissal of Comey and James Indictments*, N.Y. Times (Dec. 19, 2025), https://www.nytimes.com/2025/12/19/us/politics/trump-james-comey-appeal.html; Devlin Barrett & Jonah E. Bromwich, *Prosecutors Said to Pursue New Investigation of Letitia James*, N.Y. Times (Jan. 8, 2026), https://www.nytimes.com/2026/01/08/us/politics/letitia-james-trump-justice-department.html.

## 2. There is no legitimate law enforcement purpose for the subpoena.

In addition to the plain evidence of improper motive, there is no apparent indication of any legitimate criminal investigation. The conduct of which the Administration publicly complains is not only non-criminal, it is part of Jacob Frey's legally defined role as Mayor. The subpoena itself does not identify or even allude to any alleged federal criminal violation (though the anonymous leaks by Administration officials refer to 18 U.S.C. § 372). In its leaks and media statements, the Administration appears to fault Mayor Frey for adhering to City policies and ordinances regarding the City's relationship with federal agencies on matters of immigration enforcement, as permitted by law.[47] For instance, on January 27, Mayor Frey reiterated that, pursuant to applicable City policy and ordinance, Minneapolis police would not enforce federal immigration laws.[48] President Trump responded that Mayor Frey was engaged in "a very serious violation of the Law, and that he is PLAYING WITH FIRE!"[49]

---

[47] *See United States v. California*, 921 F.3d 865, 890-91 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020); *McHenry County v. Kwame Raoul*, 44 F.4th 581, 592 (7th Cir. 2022); *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014); *City & County of San Francisco v. Trump*, 779 F. Supp. 3d 1077, 1082, *appeal docketed*, No. 25-3889 (9th Cir. 2025); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018), *aff'd on other grounds*, 961 F.3d 882 (7th Cir. 2020); *City of Los Angeles v. Sessions*, No. 18 Civ. 7347, 2019 WL 1957966, at *4 (C.D. Cal. Feb. 15, 2019), *appeal dismissed*, No. 20-55926, 2021 WL 837292 (9th Cir. Jan. 14, 2021).

[48] Ashleigh Fields, *Frey to Homan: Minneapolis 'Will Not Enforce Federal Immigration Laws,'* Hill (Jan. 27, 2026), https://thehill.com/homenews/state-watch/5709296-frey-homan-sanctuary-policies-minneapolis.

[49] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 28, 2026, at 8:23 AM), https://truthsocial.com/@realDonaldTrump/posts/115972940749866695.

It is, of course, emphatically *not* a violation of federal law for states and localities to refuse to participate in immigration enforcement. *See California*, 921 F.3d at 890-91; *McHenry County*, 44 F.4th at 592; *Galarza*, 745 F.3d at 643.

But Mayor Frey is, quite literally, performing his job under Minneapolis law. In his role as mayor, he serves as the "chief spokesperson" for the City, MCO § 11.10, and "represent[s] the city in its intergovernmental relations," MCO § 11.20(7). The Administration's frustration with Mayor Frey's lawful execution of his official duties cannot serve as the basis for a federal criminal investigation, nor for this subpoena. Insofar as the Administration is attempting to challenge the lawfulness of the city's policies and ordinances, a grand jury subpoena directed to the Office of the Mayor is not the appropriate means for resolving that dispute. *See* Complaint ¶¶ 108-114, 134, *United States v. Minnesota*, No. 25 Civ. 3798 (D. Minn. Sep. 29, 2025), ECF No. 1 (Administration challenging MCO §§ 19.30(a)(1), 19.30(a)(3), and 19.60(d) as violating the Supremacy Clause).

The subpoena itself also raises more questions than it answers about whether it was issued in connection with any legitimate criminal investigation. *See* Ex. A. It is riddled with irregularities, large and small, including:

- It is issued in the name of the U.S. Attorney—the only political appointee in the U.S. Attorney's Office—who reports directly to the Deputy Attorney General.

- The subpoena does not identify any Assistant U.S. Attorney or career prosecutor as leading or involved in the investigation.

- The subpoena does contain a direction to contact "the Assistant United States Attorney" with respect to "other issues," but no AUSA is assigned or identified.

- It does not identify any individual federal law enforcement agent assigned to the matter, merely providing the main office number for the FBI Minneapolis Field Office as a law enforcement contact.

- The subpoena would require the custodian of records to appear for testimony, and it provides no opportunity for the custodian to comply through delivery of records rather than testimony, as is routinely the case.

- The subpoena includes an internal office tracking number that appears to suggest the investigation was opened in 2022, which is inconsistent with the apparent focus on conduct that is alleged to have occurred in 2025 and 2026.

*See* Ex. A at 1. At best, these irregularities suggest the subpoena was hurriedly prepared by someone who is not an experienced prosecutor, and who is not familiar with the standard practices used in this District and across U.S. Attorney's Offices. At worst, they are further confirmation that the Administration is leveraging the powers of the grand jury for improper purposes.

The substance of the subpoena's numerous requests—which seek records and communications regarding implementation of the City's approach to federal immigration enforcement under its municipal ordinances and policies—bears more similarity to ordinary civil discovery requests or routine public-office data requests than to the demands of a grand jury subpoena. *See* Ex. A at 5. Document requests are a standard part of civil discovery, and the federal government has already sued Minneapolis over its so-called "sanctuary" policies. *See* Complaint, *United States v. Minnesota*, No. 25 Civ. 3798 (D. Minn. Sep. 29, 2025), ECF No. 1. In addition, the Minnesota Government Data Practices Act provides an orderly procedure to request such records from state and local government offices, with appropriate exceptions. *See* Minn. Stat. § 13.03. Yet the Administration chose to invoke its grand jury subpoena power and leak its use rather than relying on such regular channels.

These deviations from ordinary procedure, paired with the Administration's public statements, are consistent with abuse of the grand jury and offer further evidence that this subpoena was the product of animus, not an effort to further a legitimate criminal investigation.

### 3. The subpoena was also issued for the improper purpose of coercing the Mayor and City to aid in federal immigration enforcement.

In addition to being retaliatory and not issued for any legitimate law enforcement purpose, the subpoena is improper and harassing for the further reasons that it seeks to coerce Mayor Frey, the City, and other state and local officials to aid in the implementation of federal immigration policy and punish them for not doing so. Invoking criminal process and threatening federal prosecution to achieve this objective is plainly an improper use of a grand jury subpoena.

The Tenth Amendment of the United States Constitution guarantees that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. Applying these principles, the Supreme Court has held that the federal government may not compel or coerce state or local governments or officials into "compliance with federal objectives." *Nat'l Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 576 (2012). Under this anticommandeering rule, "[t]he Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997). The rule applies whether the federal

27

government "directly commands" state or local action or "indirectly coerces" it, *NFIB*, 567 U.S. at 578, whether the pressure comes from federal "legislation or executive action," *Printz*, 521 U.S. at 925, and it applies no matter how strong of an interest the federal government claims, *see New York v. United States*, 505 U.S. 144, 178 (1992).

Since 2003, the people of Minneapolis have chosen to promote trust in and cooperation with local law enforcement by prohibiting public safety officials from engaging in federal immigration enforcement. *See* MCO § 19.30. That is the City's right, and as its chief executive, Mayor Frey has the authority to lead the City in a manner consistent with the City's chosen policies and ordinances. Courts across the country have held that under the anticommandeering principle, states and localities may choose not to assist in federal immigration enforcement. *See, e.g., United States v. California*, 921 F.3d 865, 890-91 (9th Cir. 2019) (explaining that states "ha[ve] the right, pursuant to the anticommandeering rule, to refrain from assisting with federal [immigration] efforts"), *cert. denied*, 141 S. Ct. 124 (2020); *McHenry County v. Kwame Raoul*, 44 F.4th 581, 592 (7th Cir. 2022) (same); *Galarza v. Szalczyk*, 745 F.3d 634, 643 (3d Cir. 2014) (same). Even if state or local officials' refusal to cooperate "makes the jobs of federal immigration authorities more difficult," the federal government cannot take the "position that such obstruction is unlawful" without "run[ning] directly afoul of the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 886, 888.

Accordingly, the federal government may not coerce state and local officials to assist with federal immigration enforcement, such as by threatening to withhold federal funding, or, as here, by threatening federal prosecution. *See, e.g., City and County of San*

28

*Francisco v. Trump*, 779 F. Supp. 3d 1077, 1082 (N.D. Cal.) (finding that executive orders freezing funding to so-called sanctuary jurisdictions likely "violate the Tenth Amendment because they impose coercive condition[s] intended to commandeer local officials into enforcing federal immigration practices and law"), *as clarified by* 782 F. Supp. 3d 830 (N.D. Cal.), *and as further clarified by* 783 F. Supp. 3d 1148, 1194-96 (N.D. Cal. 2025), *appeal docketed*, No. 25-3889 (9th Cir. 2025); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 873 (N.D. Ill. 2018) (requiring local authorities "to stand aside and allow the federal government to conscript the time and cooperation of local employees . . . robs the local executive of its autonomy"), *aff'd on other grounds*, 961 F.3d 882 (7th Cir. 2020); *City of Los Angeles v. Sessions*, No. Civ. 18-7347-R, 2019 WL 1957966, at *4 (C.D. Cal. Feb. 15, 2019) (forcing state and local law enforcement to partner with federal immigration authorities "infringes[s] upon the state police power" and "upset[s] the constitutional balance"), *appeal dismissed*, No. 20-55926, 2021 WL 837292 (9th Cir. Jan. 14, 2021).

As explained in more detail above, the challenged grand jury subpoena is part of an ongoing campaign by the Administration to coerce Mayor Frey, Governor Walz, and other state and local officials to aid in federal immigration enforcement despite state and local policies prohibiting such assistance. This coercive purpose is out in the open: According to the Administration, the Mayor and City face "[c]onsequences" for refusing to be conscripted into enforcing federal immigration law, including the "full weight of federal

law enforcement" and the Department of Justice "advancing action on every front," with "federal grand jury subpoenas from this DOJ" and "[m]ore arrests . . . coming."[50]

The subpoena itself also supplies evidence of this coercive purpose. Among other subjects, the requests target the manner in which City officials have engaged in and discussed "cooperation or lack of cooperation with federal immigration authorities," "compliance with immigration detainers," and "compl[iance] with immigration officers." Ex. A at 5. In other words, the subpoena probes the extent to which City officials have or have not "compli[ed] with federal objectives" in the realm of immigration enforcement. *NFIB*, 567 U.S. at 576. Yet there can be no proper law enforcement purpose in criminally investigating state or local compliance with such objectives when courts consistently have held that state and local officials lawfully may withhold the cooperation the Administration seeks. *E.g.*, *California*, 921 F.3d at 890-91; *Chicago*, 321 F. Supp. 3d at 873; *City of Los Angeles*, 2019 WL 1957966, at *4.

In *Minnesota v. Noem*, the district court declined to preliminarily order federal agents participating in Operation Metro Surge to stand down under the Tenth Amendment because it found, under the exacting standards that apply to requests for preliminary injunctive relief, that a factfinder could conclude that the federal government surged federal agents to Minneapolis for reasons other than coercion. *Minnesota v. Noem*, No. 26 Civ. 190, slip op. at 20-22 (D. Minn. Jan. 31, 2026), ECF No. 135. The court described the

---

[50] The White House, *supra* note 20; Attorney General Pamela Bondi (@AGPamBondi), X (Jan. 24, 2026, at 9:07 PM), https://x.com/AGPamBondi/status/2015245175644168618?s =20.

plaintiffs' position that "Operation Metro Surge is . . . a campaign of pressure to force Plaintiffs to yield and abandon their 'sanctuary' policies" as "not without merit," and it detailed the extensive circumstantial and direct evidence of a coercive motive by the Administration. *Id.* at 5-10, 18. But, faced with "unclear" indications of the "relative merits of each side's competing positions," the court issued a careful and limited denial of injunctive relief that "ma[de] no final determination on the merits of any claims asserted by Plaintiffs." *Id.* at 2, 22.

The evidence presented here—both the face of the subpoena itself and the Administration's statements and actions surrounding it—makes plain that the subpoena serves no proper law enforcement purpose and *could not* serve such a purpose. Indeed, the Administration has no legitimate reason to criminally investigate City officials for upholding local ordinances that have been on the books since 2003 and reflect policies that courts have repeatedly held local jurisdictions have a right to adopt, *see, e.g.*, *California*, 921 F.3d at 890-91 ("Even if [state or local law] obstructs federal immigration enforcement, the United States' position that such obstruction is unlawful runs directly afoul of the Tenth Amendment and the anticommandeering rule.").

The grand jury subpoena therefore must be quashed because it lacks any legitimate law enforcement purpose and was issued for the improper purpose of coercing Mayor Frey and other officials to aid in the implementation of federal immigration policy.

**4. Because it was issued in bad faith and for improper purposes, the subpoena must be quashed.**

Although it is infrequent that courts quash grand jury subpoenas, ample authority supports doing so when the subpoena, like the one here, is issued in bad faith and meant to harass, rather than pursue legitimate law enforcement purposes. Courts have recognized that "[t]he prosecutor's abuse of his special relationship to the grand jury poses an enormous risk to defendants," *United States v. Serubo*, 604 F.2d 807, 817 (3d Cir. 1979), and "[t]he actions of the government should be closely scrutinized" whenever there is credible reason to believe it is abusing the grand jury's subpoena power, *United States v. Finazzo*, 407 F. Supp. 1127, 1131 (E.D. Mich. 1975). Indeed, grand jury subpoenas "are in fact almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch." *In re Grand Jury Proc.*, 486 F.2d 85, 90 (3d Cir. 1973). Because "the potential for abuse is so great, and the consequences of a mistaken indictment so serious . . . the obligation of the judiciary to protect against even the appearance of unfairness, [is] correspondingly heightened." *Serubo*, 604 F.2d at 817. In the analogous context of administrative subpoenas, courts have recently quashed subpoenas served "to harass and intimidate" parties to stop engaging in lawful activities. *See In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025).[51]

_____

[51] Indeed, an unbroken recent string of district-court decisions have held that this Administration issued administrative subpoenas for patient medical records improperly and for illegitimate purposes related to advancing policy goals. *See In re Subpoena Duces Tecum No. 25-1431-016*, No. 25 Misc. 41, 2025 WL 3562151, at *12 (W.D. Wash. Sep. 3, 2025) (holding "evidence shows that the DOJ requested documents as part of an effort to (continued...)

The Supreme Court's decision addressing a state grand jury subpoena issued to the President in *Trump v. Vance* acknowledges these principles, relying on their availability to address harassing subpoenas on a case-by-case basis as reason for declining to apply any blanket protection to the President. 591 U.S. 786, 810 (2020). Considering whether the President could be subject to such subpoenas, the Court recognized that "harassing subpoenas could, under certain circumstances, threaten the independence or effectiveness of the Executive," particularly when wielded by prosecutors with "political motivations." *Id.* at 805. A subpoena, it noted, could be improperly weaponized "to manipulate a President's policy decisions or to retaliate against a President for official acts." *Id.* at 806 (cleaned up). The Court rejected these concerns as a categorical defense to such subpoenas because it recognized that "the law already seeks to protect against the predicted abuse" in individual cases by allowing courts to quash grand jury subpoenas initiated "out of malice or an intent to harass." *Id.* at 805 (citation omitted). That pre-existing law must be applied here to protect against abuse of the grand jury process to "manipulate . . . [Mayor Frey's] policy decisions or to retaliate against [him] for official acts." *Id.* at 806 (cleaned up).

The Court should quash the subpoena outright. If the Court has any doubts, however, it should require the federal government to explain the basis for the subpoena

end gender-related care for minors"); *QueerDoc, PLLC v. U.S. Dep't of Just.*, No. 25 Misc. 42, 2025 WL 3013568, at *4 (W.D. Wash. Oct. 27, 2025), *appeal docketed*, No. 25-7384 (9th Cir. Nov. 24, 2025); *In re Subpoena No. 25-1431-014*, No. 25 Misc. 39, 2025 WL 3252648, at *33-34 (E.D. Pa. Nov. 21, 2025); *In re 2025 UPMC Subpoena*, No. 25 Misc. 1069, 2025 WL 3724705, at *3 (W.D. Pa. Dec. 24, 2025); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, No. 25 Misc. 63, 2026 WL 33398, at *1 (D. Colo. Jan. 5, 2026); *In re 2025 Subpoena to Children's Nat'l Hosp.*, No. 25 Civ. 03780, 2026 WL 160792, at *6-8 (D. Md. Jan. 21, 2026).

before evaluating whether Mayor Frey and the City have satisfied their burden. *See R. Enters.*, 498 U.S. at 302 (explaining that "a court may be justified . . . in requiring the Government to reveal the general subject of the grand jury's investigation before requiring the challenging party to carry its burden of persuasion"); *see also In re Faltico*, 561 F.2d 109, 111 (8th Cir. 1977) (per curiam) (noting that district court held an evidentiary hearing and reviewed materials *in camera* in connection with motions to quash).

To be sure, a grand jury subpoena that is "issued through normal channels" is entitled to a presumption of regularity. *R. Enters.*, 498 U.S. at 301; *see also Universal Mfg. Co. v. United States*, 508 F.2d 684, 685 (8th Cir. 1975) (per curiam). But the subpoena challenged here—issued amidst explicit threats of retaliation by the President and Department of Justice leadership and the subject of leaks by anonymous "officials" fanning the flames of media attention, and riddled with irregularities—is anything but normal. When a subpoena is *not* issued through normal channels, it "lack[s] the regularity required for a presumption of reasonableness." *In re Grand Jury Subpoenas to Off. of N.Y. State Att'y Gen.*, No. 25 Misc. 19, 2026 WL 60793, at \*11 (N.D.N.Y. Jan. 8, 2026), *appeal docketed*, No. 26-156 (2d Cir. Jan. 23, 2026).

The grand jury subpoena is therefore not entitled to the presumption of regularity. *See Fed. Educ. Ass'n v. Trump*, 795 F. Supp. 3d 74, 90-92 (D.D.C. 2025) (cataloging cases and noting "[i]n just six months, the President of the United States may have forfeited the right to such a presumption of regularity"), *appeal docketed*, No. 25-5303 (D.C. Cir. Aug. 20, 2025); *cf. Ziliang J. v. Noem*, No. 25 Civ. 1391, 2025 WL 1358665, at \*2 (D. Minn. Apr. 17, 2025) (Schiltz, C.J.) ("[T]he Court cannot imagine how the public interest might

34

be served by permitting federal officials to flaunt the very laws that they have sworn to enforce."). But even if the presumption were to apply, it is plainly overcome by the substantial and concrete evidence of bad-faith intent to retaliate and harass that goes far beyond "general allegations of misuse." *See Universal Mfg. Co.*, 508 F.2d at 685.

**C.     The Subpoena Is Unenforceable Under the First Amendment**

The subpoena should also be quashed because it violates the First Amendment. The First Amendment forbids the government from using its power to "punish or suppress disfavored expression." *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 188 (2024). First Amendment protections apply with special force where, as here, the government wields criminal process against a speaker. *See Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244 (2002) ("[I]mposing criminal penalties on protected speech is a stark example of speech suppression."). And they reach their apex when the government targets speech based on its political message. *Morse v. Frederick*, 551 U.S. 393, 403 (2007) ("Political speech . . . is at the core of what the First Amendment is designed to protect." (citation omitted)); *Vullo*, 602 U.S. at 187 ("[V]iewpoint discrimination is uniquely harmful to a free and democratic society.").

These bedrock principles apply to grand jury subpoenas. "[G]rand juries must operate within the limits of the First Amendment." *Branzburg v. Hayes*, 408 U.S. 665, 708 (1972); *see also United States v. Dionisio*, 410 U.S. 1, 12 (1973). The government therefore cannot use grand jury subpoenas as a tool for "[o]fficial harassment" of those who exercise their First Amendment rights. *Branzburg*, 408 U.S. at 707-08. That is particularly true when an investigation targets those who "criticize the Government." *Bursey v. United*

*States*, 466 F.2d 1059, 1089, 1081-86 (9th Cir. 1972), *superseded by statute on other grounds as stated in In re Grand Jury Procs.*, 863 F.2d 667, 669-70 (9th Cir. 1988). The First Amendment does not allow the government to "transform[]" the grand jury "into an instrument of oppression." *Dionisio*, 410 U.S. at 12. And courts have stepped in when subpoenas are used to punish or deter disfavored speakers. *Bursey*, 466 F.2d at 1085-86, 1089 (subpoena targeting staff of *The Black Panther* newspaper); *Ealy v. Littlejohn*, 569 F.2d 219, 230 (5th Cir. 1978) (subpoena targeting individuals who "had criticized" district attorney).

That is precisely the case here. The subpoena targets Mayor Frey and his Office in retaliation for Mayor Frey's constitutionally protected speech that the Administration disfavors. "Given the close connection between the Office of the [Mayor] and its occupant," the Mayor, a retaliatory subpoena issued to the Mayor's Office is retaliation against the Mayor. *Mazars*, 591 U.S. at 868; *see also Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67-71 (1963) ("look[ing] through forms to the substance" to conclude that government action directed at intermediary amounted to censorship); *Lacey v. Maricopa County*, 693 F.3d 896, 909, 916-17 (9th Cir. 2012) (en banc) (upholding newspaper owners' retaliation claim based on grand jury subpoenas directed at newspaper). The Administration's retaliatory motive is clear here, both from its repeated and explicit threats to exact retribution against Mayor Frey for his public statements, as well as the lack of any legitimate reason for criminally targeting Mayor Frey on that basis. *See supra* Section IV.B.

As a bedrock principle, the First Amendment applies because Mayor Frey has engaged in constitutionally protected speech on matters of public importance. Minneapolis sits at the center of the current national debate on immigration enforcement tactics. Mayor Frey has repeatedly and forcefully criticized the Administration in public statements. *See* MCO § 11.20(7) (mayor "shall . . . promote . . . the prosperity and social well-being of [the City's] people"). He has urged Minneapolis residents who wish to voice their criticism to do so through peaceful protest. And he has advocated for and supported Minneapolis' lawsuit challenging the Administration's immigration operations.[52] These activities are core First Amendment speech and are entitled to the greatest protection. *See Morse*, 551 U.S. at 403.

"The First Amendment surely promises an elected representative like [Mayor Frey] the right to speak freely on questions of government policy." *Hou. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022). It also "prohibits government officials from subjecting" Mayor Frey "to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *see also Vullo*, 602 U.S. at 188 (government officials "cannot "punish" views they "disfavor" through their "power to investigate" (citation omitted)); *Media Matters for Am. v. Paxton*, 138 F.4th 563, 580 (D.C. Cir. 2025).

Yet the Administration has done precisely that, as its own statements make abundantly clear. *See Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1156 (D. Minn.

---

[52] *See State of Minnesota, Minneapolis and Saint Paul Sue to Halt ICE Surge into Minnesota*, Minneapolismn.gov (Jan. 12, 2026), https://www.minneapolismn.gov/news/2026/january/ag-lawsuit.

2025), *appeal docketed*, No. 25-2516 (8th Cir. July 31, 2025); *Zaid v. Exec. Off. of President*, No. 25 Civ. 1365, 2025 WL 3724884, at *8 (D.D.C. Dec. 23, 2025), *appeal docketed*, No. 26-05009 (D.C. Cir. Jan. 13, 2026). A week before the issuance of the subpoena, and only a day after Minneapolis sued the Administration, the President warned Minnesotans that "RETRIBUTION IS COMING!"[53] Immediately after, high-ranking federal officials began to threaten Mayor Frey with prosecution for his public statements. In a social media post, Deputy Attorney General Blanche wrote that Mayor Frey and Governor Walz had "encourage[ed] violence" and added: "Walz and Frey - I'm focused on stopping YOU from your terrorism by whatever means necessary. This is not a threat. It's a promise."[54] In another post, Secretary Noem falsely stated that Mayor Frey is "encouraging impeding and assault against our law enforcement which is a federal crime, a felony."[55] Blanche later stated that merely "encouraging citizens to call 911 when they see ICE officers … is very close to a federal crime."[56] And Stephen Miller described Mayor Frey's "words" as "clearly an insurgency against the federal government."[57]

---

[53] Donald J. Trump (@realDonaldTrump), Truth Social (Jan. 13, 2026, at 8:40 AM), https://truthsocial.com/@realDonaldTrump/posts/115888070937502023.

[54] Todd Blanche (@DAGToddBlanche), X (Jan. 14, 2026, at 9:03 PM), https://x.com/DAGToddBlanche/status/2011620198751597028.

[55] Secretary Kristi Noem (@Sec_Noem), X (Jan. 15, 2026, at 11:21 AM), https://x.com/Sec_Noem/status/2011836220108607536?s=20.

[56] Alexandra Koch, David Spunt & Matt Finn, *Federal Prosecutors Open Investigation into Walz, Frey over Alleged Impeding of Law Enforcement*, Fox News (Jan. 16, 2026), https://www.foxnews.com/politics/federal-prosecutors-open-investigation-walz-frey-over-alleged-impeding-law-enforcement.

[57] Ryan Mancini, *Stephen Miller: Minnesota Officials Staging 'Insurgency Against the Federal Government*,' Hill (Jan. 15, 2026), https://thehill.com/homenews/administration/5691618-miller-accuses-minnesota-officials-insurgency.

Many of these threats incorporate a false premise: that Mayor Frey's speech amounts to incitement of violence and lawlessness, a narrow category of speech not protected by the First Amendment. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam); *Hess v. Indiana*, 414 U.S. 105, 107 (1973). But there is no basis for believing that Mayor Frey's public statements meet the stringent standard for incitement. Mayor Frey has never encouraged the public to engage in violent acts against federal officers or otherwise violate the law, as the Administration asserts. Quite the opposite—he has repeatedly urged the public to "prioritize safety *for all*" and engage in only "peaceful protests."[58] And he has warned protesters that they will be "arrested" if they "cause damage to property or put others in danger."[59] Such statements do not constitute incitement. *See Nwanguma v. Trump*, 903 F.3d 604, 611-12 (6th Cir. 2018) (then-candidate Trump's statement at rally to "get [protesters] out of here" did not incite violence when accompanied with admonition, "don't hurt 'em"). Instead, they are First Amendment-protected speech of the highest order. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 909 (1982).

Mayor Frey's political "rhetoric" also does not provide a valid basis for a grand jury investigation.[60] "The language of the political arena . . . is often vituperative, abusive, and

---

[58] *City Requests MN National Guard to Help with Staffing After 3rd Shooting by Federal Agents*, Minneapolismn.gov (Jan. 24, 2026), https://www.minneapolismn.gov/news/2026/january/national-guard/ (emphasis added) ("[City leaders] urged community members to continue to prioritize safety for all and engage in peaceful protest.").

[59] *Mayor Frey Encourages Protestors to Demonstrate Peacefully After Multiple Arrests on Friday*, KSTP (Jan. 10, 2026), https://kstp.com/kstp-news/top-news/mayor-frey-encourages-protestors-to-demonstrate-peacefully-after-multiple-arrests-on-friday.

[60] Donald J. Trump (@realDonald Trump), Truth Social (Jan. 24, 2026, at 2:06 PM), https://truthsocial.com/@realDonaldTrump/posts/115951636521315703.

inexact." *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam) (statement at political rally that speaker would shoot elected official was protected political hyperbole). The First Amendment nonetheless protects such expression, including "crude" and "offensive method[s] of stating a political opposition to the President." *Id.* As such, the First Amendment also prohibits retaliation based upon it. Dislike Mayor Frey's speech as they may, Administration officials may not use grand jury process or other criminal enforcement tactics to retaliate against him for engaging in it.

**D.      The Administration's Apparent Rule 6(e) Violations Are Further Evidence of Irregularity and Bad Faith, and the Court Should Order the Government to Explain Itself at a Show Cause Hearing**

As discussed above, the Administration appears to have violated Federal Rule of Criminal Procedure 6(e) by leaking confidential grand jury matters to the media. That violation further confirms the Administration's bad faith and supports quashing the subpoena. At minimum, the record warrants a show cause hearing so that the Administration can explain its misconduct.

Rule 6(e) protects the integrity and fairness of the grand jury process by barring disclosure of matters occurring before the grand jury. *See* Fed. R. Crim. P. 6(e)(2)(B). Under this rule, government officials cannot disclose an investigation's "targets" and "subject matter" to unauthorized individuals. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 259 (1988); *In re Sealed Case No. 99-3091*, 192 F.3d 995, 1004-05 (D.C. Cir. 1999) ("[I]t would ordinarily be a violation of Rule 6(e) to disclose that a grand jury is investigating a particular person."). Grand jury secrecy exists to, among other reasons,

40

"protect [the] innocent." *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 219 n.10 (1979) (citation omitted).

The circumstances and timing leave no doubt that Administration officials were the source of the grand jury leak.[61] Four days before service of the subpoenas, major news outlets announced that the Department of Justice was investigating Minnesota state and local officials for violating federal criminal law.[62] The news reports expressly credited the Administration—including a "senior law enforcement official"—with releasing the leaked information.[63] An hour after the first report, Attorney General Bondi posted a veiled threat on social media: "A reminder to all those in Minnesota: No one is above the law."[64]

The media reports included details known only to the federal government that Rule 6(e) requires be shielded from public disclosure. In particular, the reports specifically named Mayor Frey and Governor Walz as among the investigation's targets; they revealed that the investigation concerned the officials' purported obstruction of federal immigration enforcement in violation of 18 U.S.C. § 372; and they disclosed the existence of (then unserved) subpoenas. At the time of the first news report, information about the

---

[61] Montoya-Galvez et al., *supra* note 29.

[62] *Id.*; Ryan J. Reilly & Peter Alexander, *DOJ Investigating Gov. Tim Walz and Mayor Jacob Frey, Sources Say*, NBC News (Jan. 16, 2026), https://www.nbcnews.com/politics/trump-administration/doj-investigating-whether-gov-tim-walz-mayor-jacob-frey-impeded-immigr-rcna254501; Stein, *supra* note 31; Durkin Richer et al., *supra* note 32.

[63] Winter & Goudsward, *supra* note 31; Thrush et al., *supra* note 31.

[64] Attorney General Pamela Bondi (@AGPamBondi), X (Jan. 16, 2026, at 7:53 PM), https://x.com/AGPamBondi/status/2012327355327340947.

investigation was uniquely in possession of federal government officials, making the Administration the only possible source of the leak.

Rule 6(e) prohibits such conduct. The Rule prevents prosecutors from litigating cases in the press and shields uncharged individuals from public exposure and unproven "stigma." *Vance*, 591 U.S. at 804; *see also Douglas Oil Co.*, 441 U.S. at 218-19. When the federal government intentionally releases a target's identity to the media, it signals bad faith and an abuse of the grand jury process. *See Bank of Nova Scotia*, 487 U.S. at 259 (public disclosure of target's identity can "be relevant to an allegation of a purpose or intent to abuse the grand jury process"). Here too, the Administration's release of grand jury matters to fuel a political narrative and embarrass state and local officials provides yet another reason to quash this subpoena.

At minimum, these facts warrant a show cause hearing to require the federal government to account for its actions. Courts ordinarily grant such hearings when a movant establishes a prima facie showing of a Rule 6(e) violation. *See In re Blue Grand Jury*, 536 F. Supp. 3d 435, 437 (D. Minn. 2021) (ordering show cause hearing and noting the court is "authorized to initiate criminal contempt proceedings"); *see also In re Grand Jury Subpoenas Dated Feb. 28, 2002, Mar. 26, 2003, Oct. 4, 2004*, 472 F.3d 990, 1000 (8th Cir. 2007) (collecting cases). That standard is met here because news reports disclosed grand jury matters and attributed the information to federal government officials. *See In re Blue Grand Jury*, 536 F. Supp. 3d at 437; *United States v. Eisenberg*, 711 F.2d 959, 963 (11th Cir. 1983); *Barry v. United States*, 865 F.2d 1317, 1321 (D.C. Cir. 1989); *In re Grand Jury Investigation*, 610 F.2d 202, 220 (5th Cir. 1980).

42

## V. CONCLUSION

For the reasons explained above, the Court should quash the subpoena and order a show cause hearing.

Dated: February 2, 2026

Respectfully submitted,

KRISTYN ANDERSON
City Attorney

By */s/* Kristyn Anderson
KRISTYN ANDERSON (#0267752)
City Attorney
DANIEL ABELSON (#0327554)
Deputy City Attorney
HEATHER P. ROBERTSON (#0390470)
Assistant City Attorney
Minneapolis City Attorney's Office
350 South Fifth Street
Minneapolis, MN 55415
(612) 673-3000
kristyn.anderson@minneapolismn.gov
daniel.abelson@minneapolismn.gov
heather.robertson@minneapolismn.gov

*Attorneys for Movant Office of the Mayor of Minneapolis and the City of Minneapolis*

/s/ Andrew Mohring
Andrew Mohring (#0190731)
GOETZ & ECKLAND P.A.
Banks Building
615 1st Avenue NE, Suite 425
Minneapolis, MN 55413
Telephone: (612) 874-1552
amohring@goetzeckland.com

Marshall Miller (NY Bar No. 2977015)*
Sean Hecker (NY Bar No. 3897444)*
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Telephone: (212) 763-0883
mmiller@heckerfink.com
shecker@heckerfink.com

Trisha Anderson (D.C. Bar No. 497224)*
Kaitlin Konkel (D.C. Bar No. 1021109)*
HECKER FINK LLP
1050 K Street NW, Suite 1040
Washington, DC 20001
Telephone: (212) 763-0883
tanderson@heckerfink.com
kkonkel@heckerfink.com

*Attorneys for Movant Jacob Frey*

*Pro hac vice motions forthcoming