Doc. #70
filed 2/24/2026

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

███████

IN RE GRAND JURY SUBPOENAS
NOS. 2022R00519-A, 2022R00519-B,
2022R00519-C, 2022R00519-D,
2022R005190-E, 2022R00519-F

**GOVERNMNENT'S
RESPONSE TO JOINT
MOTION TO QUASH**

## INTRODUCTION

The City of Saint Paul, the City of Minneapolis, the Hennepin County Board of Commissioners, the Ramsey County Board of Commissioners, Governor Tim Walz, and the Office of the Minnesota Attorney General (collectively, "movants"), ask this Court to take the extraordinary step of quashing a pre-indictment grand jury subpoena. They do so not because the subpoenas seek privileged material, personal testimony, or constitutionally protected speech, but because the subpoenas seek institutional records from municipal custodians in furtherance of an ongoing federal investigation. Supreme Court and Eighth Circuit precedent foreclose this request. Grand jury subpoenas are entitled to a presumption of regularity, require no showing of probable cause, and may issue to investigate merely on suspicion or to obtain assurance that the law has not been violated. The movants' effort to repackage policy disagreements, speculative allegations of motive, and *post*

*hoc* constitutional theories into grounds for quashing a grand jury subpoena fails as a matter of law.

These subpoenas issued in furtherance of an investigation into potential obstruction of federal agents in performance of their lawful duties. Grand jury subpoenas, as part of the investigative function of the federal criminal system, exist to determine whether federal law has been violated. They do not adjudicate the validity of underlying policy disputes; they investigate potential criminal interference with the execution of federal law. Allowing allegations of policy disagreement or blind speculation as to motive to halt such investigations would invert the constitutional design by transforming investigative proceedings into preemptive adjudications.

## LEGAL STANDARD

"The broad investigatory powers of the grand jury are both historic and essential to their effective operation." *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972). "[A grand jury] investigation may be triggered by tips, rumors, evidence proffered by the prosecutor, or the personal knowledge of the grand jurors." *Id.* "The reliability of such rumor, tips, or suggestions is not relevant." *In re Grand Jury Proceedings: Subpoeans Duces Tecum*, 827 F.2d 301, 305 (8th Cir. 1987) (citation omitted). "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious

administration of the criminal laws." *Branzburg v. Hayes* at 350 (citing *United States v. Dionisio*, 410 U.S. 1, 17 (1973)).

Accordingly, a subpoena issued in the ordinary course is presumed valid. "A grand jury subpoena issued through normal channels is presumed to be reasonable, and the burden of showing otherwise is on the recipient." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 300 (1991). "In short, the Government cannot be required to justify the issuance of a grand jury subpoena by presenting evidence sufficient to establish probable cause because the very purpose of requesting the information is to ascertain whether probable cause exists." Id at 297. The grand jury "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. Morton Salt Co.*, 338 U.S. 632, 643-643 (1950). "A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.'" *United States v. Calandra*, 414 U.S. 338, 344 (1974)(citing *United States v. Stone*, 429 F.2d 138, 140 (C.A.2 1970)).

If the recipients of a grand jury subpoena seek to quash the subpoena on First Amendment grounds, the government need only establish "a sufficient nexus between the information sought and the subject matter of the

investigation." *In re Faltico*, 561 F.2d 109, 111 (8th Cir. 1977); *see also In re Grand Jury Subpoenas Duces Tecum*, 78 F.3d 1307, 1312-13 (8th Cir. 1996).

## ARGUMENT

**A. The factual predicate for the subpoenas in this case does not implicate First Amendment issues and are sufficiently tied to a compelling government interest.**

The subpoenas at issue are supported by sufficient factual predicate to demonstrate a legitimate investigative purpose, grounded in documented policies, trainings, and directives by state and local officials and agencies concerning the obstruction, hindrance, and interference with federal immigration enforcement. As an initial matter, the government has an obvious compelling interest in investigating potential obstruction of federal agents' lawful activity. So long as there is a "sufficient nexus" between the records requested in these subpoenas and the government's interest in investigating obstruction of federal agents, movants' First Amendment arguments fail.

The information discussed below shows that governmental entities implemented formal and informal policies potentially designed to impede, hinder, and obstruct ICE operations, including internal guidance instructing employees not to confirm the presence of individuals sought by ICE, not to consent to entry even when presented with warrants, and to engage in "respectful stalling" while escalating matters internally. Training materials

from county agencies further directed staff on how to delay or frustrate ICE access, while municipal policies facilitated the release of vehicles abandoned due to ICE detention, undermining evidence preservation and eliminating deterrents to criminal activity. Viewed collectively and in context, these facts establish a reasonable basis to investigate whether coordinated actions, directives, and communications crossed from lawful policy disagreement into intentional obstruction, interference, or facilitation of resistance to federal law enforcement, thereby justifying the scope and issuance of the challenged subpoenas.

### 1. Mayor Kaohly Her: Defiance of Federal Subpoenas

In January 2026, newly elected St. Paul Mayor Kaohly Her publicly announced at a City Hall press conference that she would "fight" DOJ subpoenas for institutional records relating to "Operation Metro Surge." Her statement was not limited to challenging allegedly unlawful or deficient subpoenas; rather, she made a broad declaration that the City would not cooperate with the federal subpoenas. By expressing categorical noncompliance with the production of records, her remarks can reasonably be understood as a refusal to comply with duly issued subpoenas.

### 2. Council Member Aurin Chowdhury: Strengthening the Separation Ordinance

In December 2025, Minneapolis City Council Member Aurin Chowdhury authored a "modernized" Separation Ordinance at Minneapolis City Hall. In addition to restricting the use of city resources for civil immigration enforcement, the ordinance required that any city official who becomes aware of ICE activity report that information to the City Council. This mandatory reporting provision creates an "early warning" system capable of identifying the location and timing of federal immigration operations. To the extent such information is disseminated in a manner that enables individuals or organizations to anticipate, evade, or interfere with federal enforcement actions, the reporting mechanism itself could be used for obstructive purposes. It is unclear what lawful purpose this information would serve, and there is an adequate basis to investigate

### 4. City Council Member Robin Wonsley: The Eviction Moratorium

In January 2026, Council Member Robin Wonsley advocated for an eviction moratorium in Minneapolis specifically to prevent ICE from "kidnapping" residents at their homes. By attempting to use housing law as a shield to prevent federal agents from accessing residential areas for arrests, Wonsley is proposing a local legal mechanism to "resist or oppose" the service

of federal process, a potential violation of the principles of federal preemption and federal statutes.

**5. Ramsey County Board: "Community Centered" Information Resistance**

In late 2025, Ramsey County disseminated internal guidance via email instructing employees that "no data or document should be provided to the ICE agent, regardless of warrant or subpoena." This directive did not limit noncompliance to unlawful or defective process; rather, it categorically instructed county personnel to withhold records even when presented with federal legal process. Such an instruction, if implemented, would directly interfere with the execution of federal warrants and subpoenas and constitutes evidence of an effort to impede a federal investigation. It is unclear from the document where the instruction originated, who the recipients were, or who authorized this instruction. Additional investigation is needed to answer all these questions.

**6. Hennepin County Staff: "Respectful Stalling" Training**

Hennepin County disseminated training materials and held a virtual training addressing how staff should respond when ICE presents a warrant and demands entry. Those materials advised employees not to confirm whether a person is present, not to consent to entry, to escalate internally, and to engage in "respectful stalling," including requesting additional time to

contact leadership even after acknowledging the existence of a warrant. Notably, there is no instruction to eventually comply with the warrant. It is unclear again who authorized, disseminated, or received these instructions. . Taken together, the Ramsey directive calling for categorical noncompliance with federal legal process and the Hennepin County training encouraging delay tactics in response to warrants constitute the two clearest documented examples of guidance that could impede the execution of federal warrants and subpoenas and explicitly obstruct federal agents in their lawful duties. The grand jury subpoenas seek additional records or communications of similar tactics, guidance, or directives to state and local employees related to the hindrance or obstruction of federal agents, or for "assurance" that no such records or communications exist. Moreover, because it is unclear where the guidance, communications, and policies set forth above originated, the subpoenas have been directed to a broad range of agencies to ensure that all potentially responsive records will be collected.

## B. The subpoenas are not a response to political rhetoric or protected speech.

Movants' arguments rely almost entirely on the notion that these subpoenas are retaliation for political rhetoric or general opposition to immigration policy. Not so. As noted above, the subpoenas followed information that state and local offices had openly instructed their employees

8

to either hinder, delay, or outright refuse to comply with federal agents in execution of their lawful duties. The Court need not be concerned with the effect on First Amendment protected speech because that is not the basis of these subpoenas. Guidance to employees to delay or obstruct ICE agents; public declarations of noncompliance with valid federal process; tracking and disseminating the locations of federal operations and sharing this information for unexpressed purposes – these and more are the bases for these subpoenas and they are more than sufficient. All persons have the right to voice opposition to a particular policy. They cannot actively engage in obstruction, hindrance, or frustration of federal agents pursuing a lawful obligation. The guidance, statements, and communications stated above implicate exactly that, and the extremely broad scope of grand jury investigations allows for investigation.

The cases cited by movants do not govern the subpoenas at issue because they arise from fundamentally different procedural and constitutional contexts. Context matters. The authority cited by the movants involve post-indictment discovery disputes, compelled personal testimony, attorney-client privilege, or circumstances in which adversarial criminal proceedings had already commenced. By contrast, the subpoenas here are pre-indictment, directed to municipal custodians of records, seek institutional—not personal—documents, and were issued in furtherance of a

lawful grand jury investigation operating at the core of its historic function. Although movants invoke a series of cases to suggest constitutional infirmity, those authorities do not withstand contextual scrutiny. As explained below, each arises from a markedly different posture and does not constrain the grand jury's investigative authority here.

Supreme Court precedent makes clear that the grand jury's role is investigative, not adjudicative, and that it may inquire "merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297 (1991). None of the cases cited by movants involve such an investigative posture. Instead, they address situations where constitutional protections attach because the government had already crossed into adversarial prosecution or sought to compel testimonial or privileged evidence. Those circumstances are absent here.

The authorities cited by movants arise from materially different procedural contexts and do not constrain a pre-indictment grand jury investigation. *Wayte* addressed selective prosecution and required proof of discriminatory effect and purpose in a charging decision, not the issuance of investigative subpoenas. *Goodwin* concerned a presumption of prosecutorial vindictiveness after formal charges were filed, which is certainly not the case here. *Serubo* involved alleged prosecutorial misconduct that tainted a grand

10

jury's charging determination, not routine investigative process. And *Finazzo* examined whether the government misused the grand jury after deciding to prosecute, thereby circumventing trial discovery rules. None of these cases involved a pre-indictment subpoena issued in furtherance of an ongoing investigation into potential federal obstruction, and none displaced the presumption of regularity that governs grand jury proceedings.

The subpoenas at issue do not target protected speech, public advocacy, or political disagreement. They are not directed at press conferences, public statements, or expressions of policy opposition to federal immigration enforcement. Instead, they seek information concerning internal communications, directives, training materials, and operational practices that bear on whether officials instructed employees to delay, withhold, or refuse compliance with federal legal process. The grand jury's inquiry is thus directed at conduct—specifically, the implementation of internal practices that obstructed the execution of federal warrants and subpoenas—not at viewpoint or expression. Framing the subpoenas as a response to protected speech mischaracterizes their purpose, scope, and the information that gave rise to the investigation. The government asks the Court to rely on the actual bases of these subpoenas in evaluating their validity, not the specters conjured in movants' brief.

11

### C. No violation of F. R. Crim. Pro. 6(e) occurred, and quashal would not be the proper relief if it had.

"For there to be a disclosure, grand jury matters must be disclosed to *someone.*" *United States v. Archer-Daniels-Midland Co.*, 785 F.2d 206, 212 (8th Cir. 1986). "Without evidence that actual misuse has occurred, a court cannot find a violation of the rule." *In re Grand Jury Subpoenas Dated Feb. 28, 2002, Mar. 26, 2003, Oct. 4, 2004*, 472 F.3d 990, 1000 (8th Cir. 2007). Movants have failed to produce evidence to establish a prima facie case of a violation of the rule, and as such the district court did not err in refusing to grant an evidentiary hearing. *See In re Sealed Case,* 250 F.3d 764, 770 (D.C.Cir.2001) (stating that once a prima facie case of a Rule 6(e) violation is shown, ordinarily the district court must then order an evidentiary hearing); *Blalock v. United States,* 844 F.2d 1546, 1551 (11th Cir.1988) (holding that if there is no prima facie case of a Rule 6(e)(2) violation, then "the court must dismiss ... without an evidentiary hearing"). Movants fail to establish a F.R.Cim.P 6(e) violation or any basis for extraordinary relief. Movants' Rule 6(e) argument rests on speculation, not proof. This is not sufficient.

To establish a violation, movants must make a prima facie showing that a person bound by Rule 6(e) disclosed information revealing the substance, direction, or internal workings of the grand jury itself. They have not done so. Media reports, timing allegations, public statements, or social-

12

media posts—even if attributed to unnamed "law enforcement officials"—do not establish disclosure of protected grand jury matters, particularly where the information discussed could have been obtained independently of the grand jury process.

Even where Rule 6(e) violations are shown, the remedy is narrowly tailored—such as contempt proceedings or protective measures—not the extraordinary step of quashing a grand jury subpoena or halting an investigation. Because movants identify no disclosed testimony, no revealed grand jury deliberations, and no evidence tracing any disclosure to a Rule 6(e)-bound person, their demand for a show-cause hearing and their attempt to bootstrap conjecture into grand jury abuse fail as a matter of law. Even if Rule 6(e) violations were assumed, quashing is not the remedy absent prejudice to the grand jury's independence, and movants allege no such prejudice.

## CONCLUSION

This case does not present an exceptional circumstance warranting the extraordinary remedy of quashing a pre-indictment grand jury subpoena. The subpoenas at issue are directed to municipal custodians, seek institutional records, and serve legitimate investigative purposes squarely within the historic and constitutional role of the grand jury. Supreme Court and Eighth Circuit precedent establish that such subpoenas are entitled to a strong

presumption of regularity, require no showing of probable cause, and may not be invalidated based on speculative assertions of motive, generalized constitutional rhetoric, or policy disagreement with federal enforcement priorities.

The movants' arguments rest on authorities arising from fundamentally different contexts and seek to transform routine investigative process into constitutional litigation. Courts have consistently rejected such efforts, recognizing that the proper function of the grand jury must not be displaced by conjecture or preemptive judicial intervention. Movants invite the Court to see any number of nefarious political machinations behind these subpoenas. The government respectfully requests that the Court not accept that invitation. Because movants cannot identify a defect beyond raw speculation, and because less intrusive remedies would be available even if any true defect were shown, the government respectfully requests that the Motion to Quash be denied.

DANIEL N. ROSEN
United States Attorney

Date: 02/23/2026

/s/ *Flavio Abreu*
BY: FLAVIO ABREU
Special Assistant U.S. Attorney