

RECEIVED

MAR 1 6 2026

CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **In re Grand Jury Subpoenas Nos.** ███████ **&** ███████<br><br>**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM,**<br><br>   **Petitioner,**<br><br>   **v.**<br><br>**UNITED STATES OF AMERICA,**<br><br>   **Respondent.** | **Miscellaneous Action No. 26-12 (JEB)** |

**MEMORANDUM OPINION**

"Jerome 'Too Late' Powell has done it again!!! He is TOO LATE, and actually, TOO ANGRY, TOO STUPID, & TOO POLITICAL, to have the job of Fed Chair. He is costing our Country TRILLIONS OF DOLLARS . . . . Put another way, 'Too Late' is a TOTAL LOSER, and our Country is paying the price!" Donald J. Trump (@realDonaldTrump), Truth Soc. (July 31, 2025, at 7:11 AM), https://perma.cc/PX9L-RPSD. That is one of at least 100 statements that the President or his deputies have made attacking the Chair of the Federal Reserve and pressuring him to lower interest rates. See generally ECF No. 14-1 (Reply to Mot. to Quash) (collecting statements). So is this: "'Too Late' Jerome Powell is costing our Country Hundreds of Billions of Dollars. He is truly one of the dumbest, and most destructive, people in Government . . . . TOO LATE's an American Disgrace!" Donald J. Trump (@realDonaldTrump), Truth Soc. (June 19, 2025, at 10:04 AM), https://perma.cc/748P-CN6T.

1

Yet the President has been unable to push rates lower through social-media posts. He has thus hinted at other options: "I want to get him out . . . ." President Trump Delivers Remarks at the U.S.-Saudi Investment Forum, White House (Nov. 19, 2025), https://www.whitehouse.gov/videos/president-trump-delivers-remarks-at-the-u-s-saudi-investment-forum/ (video at 42:01–42:58). Several months ago, he mused that if the Fed does not cut rates, "I may have to force something." Alex Gangitano, Trump Calls Jerome Powell "Numbskull," Says He May "Force Something" on Fed, The Hill (June 12, 2025), https://thehill.com/homenews/5346728-trump-jerome-powell-interest-rates/. Appointed officials and the White House Press Secretary have taken up the call. See Pulte (@pulte), X (July 2, 2025, at 11:43 AM), https://perma.cc/22DT-7TH3 (Federal Housing Finance Agency Director William Pulte calling on Congress to investigate Powell); Fed's Powell Responds to White House on Fed Headquarters Renovation, Reuters (July 17, 2025), https://perma.cc/8CVF-FW4M (White House Press Secretary announcing that "the administration, led by the president, is looking into" Fed's renovations).

Perhaps it comes as no surprise, then, that the D.C. U.S. Attorney's Office has recently opened a criminal investigation into Powell. It has served two subpoenas on the Federal Reserve Board of Governors, seeking records about recent renovations of the Board's buildings and testimony that Powell delivered to Congress that briefly discussed those renovations. The Board has now responded with a Motion to Quash, contending that the subpoenas are merely part of the gameplan to pressure Powell to bend to the President's wishes or to get rid of him. The case thus asks: Did prosecutors issue those subpoenas for a proper purpose? The Court finds that they did not. There is abundant evidence that the subpoenas' dominant (if not sole) purpose is to harass and pressure Powell either to yield to the President or to resign and make way for a Fed Chair

2

who will. On the other side of the scale, the Government has offered no evidence whatsoever that Powell committed any crime other than displeasing the President. The Court must thus conclude that the asserted justifications for these subpoenas are mere pretexts. It will therefore grant the Board's Motion to Quash. It will also grant the Board's Motion to Partially Unseal the Motion to Quash, related briefing, and this Opinion.

I.    **Background**

A.    Factual Background

Monetary policy poses a constant tradeoff: lowering interest rates can create jobs and lift wages, but it can also speed up inflation. The full force of those effects does not arrive simultaneously; instead, lower rates can trigger a quick boom, while the inflation that they spur often does not fully kick in until later. See William D. Nordhaus, The Political Business Cycle, 42 Rev. Econ. Stud. 169, 170 (1975). Those short-term benefits and long-term costs create a conflict between what is best for incumbent politicians and what is best for the nation's long-term economic stability. Id. at 184–85; Alberto Alesina, Macroeconomics and Politics, 3 NBER Macroeconomics Ann. 13, 39–40 (1988). No politicians are more accountable for the nation's economic performance — and so more tempted to cut rates for immediate gain — than our presidents.

Congress foresaw that danger. It therefore entrusted rate-setting to the Federal Reserve and shielded it from political pressure. Under the system that Congress created, a target interest rate is set by the Federal Open Market Committee. See 12 U.S.C. § 263(b); About the FOMC, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 18, 2026), https://perma.cc/UQ4W-C5XF. The FOMC is composed of the Governors of the Federal Reserve Board — who can be removed only for cause, see 12 U.S.C. § 242 — and members from the Fed's regional reserve banks (like the

Federal Reserve Bank of New York), in whose selection the President plays no role. Id., § 263(a).

President Trump has long objected to that insulation and has strenuously pushed for lower rates. "I feel that the president should have at least [a] say in [interest rates]," he has said, "[Y]eah, I feel that strongly." Jeanna Smialek, Trump Suggests That President Should Have a "Say" in Interest Rates, N.Y. Times (Aug. 8, 2024), https://perma.cc/QE6A-9CGK. After hectoring the Fed to lower rates and expressing his frustration that it has not listened, Trump joked, "Am I allowed to appoint myself at the Fed? I'd do a much better job than these people." President Trump Calls Fed Chair Powell Stupid, C-SPAN (June 18, 2025), https://www.c-span.org/clip/white-house-event/president-trump-calls-fed-chair-powell-stupid/5165846 (video at 1:58–2:07). More recently, as he considered whom to appoint as the Fed's next Chair, Trump vowed, "Anybody that disagrees with me will never be the Fed Chairman!" Donald J. Trump (@realDonaldTrump), Truth Soc. (Dec. 23, 2025, at 12:55 PM), https://perma.cc/6NCY-DBHA.

Until such replacement arrives, the Fed is chaired by Jerome Powell. Even as the President has publicly badgered the Fed to lower rates, Powell and the FOMC have steered an independent course based on their reading of the economic data. Compare, e.g., Donald J. Trump (@realDonaldTrump), Truth Soc. (Jan. 13, 2026), https://perma.cc/6LSK-2BPZ ("Jerome 'Too Late' Powell should cut interest rates, MEANINGFULLY!!! If he doesn't he will just continue to be, 'TOO LATE!'"), with Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Issues FOMC Statement (Jan. 28, 2026), https://perma.cc/47U5-GG5G (keeping rates steady because "economic activity has been expanding at a solid pace," "[j]ob gains have remained low," "the unemployment rate has shown some signs of stabilization," and "[i]nflation

4

remains somewhat elevated"). During Powell's tenure, that has usually meant raising rates. Federal Funds Effective Rate, FRED, https://perma.cc/ANG9-PPAX.

That has displeased President Trump. During his first and second terms, he has kept up a near-constant campaign to push the Fed to lower rates and has publicly berated it when it has not obliged. E.g., Donald J. Trump (@realDonaldTrump), Truth Soc. (Sept. 10, 2025, at 9:08 AM), https://perma.cc/FX48-WAK6 ("'Too Late' must lower the RATE, BIG, right now. Powell is a total disaster, who doesn't have a clue!!!"); Christina Wilkie & Everett Rosenfeld, Trump Doubles Down on Fed Attacks, Saying It's "Going Loco", CNBC (Oct. 11, 2018), https://perma.cc/7BAP-UPDC ("The problem I have is with the Fed. The Fed is going wild. I mean, I don't know what their problem is that they are raising interest rates and it's ridiculous. . . . The Fed is going loco . . . . I'm not happy about it.").

Trump has specifically aimed his anger at Chair Powell. For years, he has berated Powell, threatened him, ordered him to lower rates, or done all three at once. See, e.g., Donald J. Trump (@realDonaldTrump), Truth Soc. (June 19, 2025, at 10:04 AM), https://perma.cc/748P-CN6T ("'Too Late' Jerome Powell is costing our Country Hundreds of Billions of Dollars. He is truly one of the dumbest, and most destructive, people in Government . . . . TOO LATE's an American Disgrace!"); Donald J. Trump (@realDonaldTrump), Truth Soc. (Apr. 17, 2025, at 6:12 AM), https://perma.cc/R9WX-GBEU ("Powell's termination cannot come fast enough!"); Donald J. Trump (@realDonaldTrump), X (Aug. 23, 2019, at 10:57 AM), https://perma.cc/AHS6-JJSZ ("My only question is, who is our bigger enemy, Jay Powell or Chairman Xi?").

Being perceived as the President's adversary has become risky in recent years. In his second term, Trump has urged the Department of Justice to prosecute such people, and the

5

Department's prosecutors have listened. For instance, the President exhorted the Attorney General to prosecute James Comey, Adam Schiff, and Letitia James. See Donald J. Trump (@realDonaldTrump), Truth Soc. (Sept. 20, 2025, at 6:44 PM), https://perma.cc/C5NJ-9GJZ. Within weeks, prosecutors had indicted Comey and James and were investigating Schiff. See United States v. Comey, No. 25-cr-272, ECF No. 1 (Indictment) (E.D. Va. Sept. 25, 2025); Press Release, U.S. Atty's Off. E.D. Va., New York State Attorney General Indicted (Oct. 9, 2025), https://perma.cc/57T2-G3TP; Document Shows DOJ Examining the Handling of Mortgage Fraud Investigating into Sen. Schiff, PBS News (Nov. 20, 2025), https://perma.cc/UA7J-TJDR.

B.     Procedural History

Consistent with this pattern, DOJ has now set its sights on Powell. The Federal Reserve's Board of Governors has been renovating some of its office buildings for several years, and the renovations have cost much more than originally projected. See ECF No. 12 (Gov. Opp. to Mot. to Quash) at 1. ▮▮▮▮▮ the D.C. U.S. Attorney's Office opened a grand-jury investigation into the renovations and into testimony that Powell had given before the Senate Banking Committee that briefly touched on them, id. at 2 — nine years after the Board approved the renovation plan, Federal Reserve's Renovation of Two Historic Buildings, Bd. of Governors of the Fed. Rsrv. Sys. (July 24, 2025), https://perma.cc/3HPD-ABLL, and four years after construction began. See Christopher Rugaber, Trading a Suit for Boots and a Hard Hat: Behind the Scenes at the Federal Reserve, Mid-renovation, AP (July 25, 2025), https://perma.cc/R89Q-NJG7. ▮▮▮▮ after that investigation opened, the President reportedly excoriated a gathering of U.S. Attorneys for not moving faster to prosecute his opponents. See ECF No. 5 (Mot. to Quash) at 11.

The next day, our U.S. Attorney's Office served two subpoenas on the Board. Id. One demanded records about the renovations. See ECF No. 5-3 (Renovations Subpoena) at ECF p. 4. The other sought records related to Powell's testimony. See ECF Nos. 5-2 (Testimony Subpoena) at ECF p. 4. When the Board did not timely respond to the subpoenas, see Gov. Opp. to Mot. to Quash at 2, the Government filed a Motion to Compel with this Court. In re Two Grand Jury Subpoenas Issued by Grand Jury No. 25-5, No. 26-gj-7, ECF No. 1 (Mot. to Compel) (D.D.C. Jan. 30, 2026); LCrR 6.1 (motions "filed in connection with a grand jury subpoena" are "assigned to the Chief Judge"). The Board, in turn, filed a Motion to Quash the subpoenas. See Mot. to Quash. At a hearing before the Court in February, the parties agreed to consolidate their Motions into a single case. See In re Two Grand Jury Subpoenas Issued by Grand Jury No. 25-5, No. 26-gj-7, Minute Order of Feb. 4, 2026. The Board also filed a Motion to Partially Unseal its Motion to Quash, see ECF No. 10 (Mot. to Unseal), and it has since asked the Court to unseal redacted versions of the Government's Opposition to the Motion to Quash, the Board's Reply in support of that Motion, and this Opinion. See Mar. Hearing Tr. at 10:10–20. The Court heard argument on both the merits and the question of disclosure on March 3, 2026.

## II. Analysis

The Court starts with the Motion to Quash, then analyzes the Motion to Unseal.

### A. Motion to Quash

This section briefly addresses the Board's standing to move to quash the subpoenas, next considers the standard governing its Motion, and last moves to the merits.

#### 1. *Standing*

Not just anyone may seek to quash a subpoena; a party must have standing to do so. In re Grand Jury, 111 F.3d 1066, 1073–74 (3d Cir. 1997). The Government, however, has not

challenged the Board's standing here. It did not raise any standing objections in its briefing, see generally Opp. to Mot. to Quash, and at our hearing, it affirmatively disclaimed any standing arguments. See Mar. Hearing Tr. at 13:14–20 (Q: "I didn't see anything in your briefs regarding standing. You are not arguing that the Board can't move to quash because it doesn't have standing, are you?" A: "No, Your Honor, we are not arguing standing . . . ."). It has therefore waived any such objection. See Keepseagle v. Perdue, 856 F.3d 1039, 1053 (D.C. Cir. 2017).

Unlike with challenges to Article III standing, one can waive challenges to standing to quash a subpoena. That is because standing to quash is not a prerequisite to a court's jurisdiction. It does not ask whether a dispute is an Article III case or controversy, nor does it test a court's statutory jurisdiction. Instead, it simply asks whether the movant is entitled to a remedy because he has a cognizable interest in the subpoenaed records. See 9A Wright & Miller's Federal Practice & Procedure § 2459 (3d ed. Sept. 2025 update). In that sense, it is like standing to seek to suppress evidence that the Government obtained by allegedly violating the Fourth Amendment. See Rakas v. Illinois, 439 U.S. 128, 133–34 (1978). The Supreme Court has made clear that Fourth Amendment standing "is not a jurisdictional question" but instead part "of the merits of a Fourth Amendment claim." Byrd v. United States, 584 U.S. 395, 410–11 (2018). By the same logic, a challenge to a party's standing to quash must also be a merits argument. If it is, then it can be waived. But see In re Grand Jury, 705 F.3d 133, 142 (3d Cir. 2012) (holding that court must consider standing to quash *sua sponte*, without any justification other than citation to case on Article III standing).

Even if the Court had to consider the Board's standing *sua sponte*, the Board would check the box easily. The caselaw on standing to quash a grand-jury subpoena is admittedly thin. What cases do exist suggest that a party has standing if it has some interest in the subpoenaed

documents — say, a property interest or a privilege. Grand Jury, 111 F.3d at 1074 (collecting cases). The Board clearly does: after all, the subpoenas seek its documents. Beyond the fact that it possesses the requested documents, the Board might also need to show that the subpoenas should be quashed because they violated the Board's rights — that is, that the Government's improper purpose threatens a right or interest of the Board's (as opposed to Powell's personal rights). Cf. Rakas v. Illinois, 439 U.S. at 133–34 (Fourth Amendment standing requires defendant to show that search or seizure violated his rights, not just somebody else's). The Board would clear that bar, too. It claims that these subpoenas' purpose is to circumvent the Board's statutory protection from political pressure and control. See Mot. to Quash at 1, 14. True, the subpoenas do that by targeting Powell. But according to the Board, going after Powell is simply the means to the Government's end of eroding the Board's statutory independence. Id. That purpose threatens a legal interest of the Board, beyond any personal right or interest of Powell himself. Even if the Government had not waived a standing challenge, then, it would fail.

### 2. *Standard*

A court "may quash" a subpoena "if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). Even if a criminal subpoena does not ultimately lead to prosecution, being subject to one can still impose costs. The subpoena's target might need to hire a lawyer, shoulder the burdens of compliance, and live with the anxiety and fear of knowing that he is under criminal investigation. While the grand jury's subpoena power is broad, it is accordingly not unlimited. As relevant here, a unanimous chorus of sister circuits agrees that courts may quash subpoenas that the Government issued for an improper purpose (the D.C. Circuit has yet to weigh in). E.g., United States v. Flemmi, 245 F.3d 24, 28 (1st Cir. 2001); United States v. Calk,

9

87 F.4th 164, 186 (2d Cir. 2023); In re Grand Jury Procs., 507 F.2d 963, 964 (3d Cir. 1975);

United States v. Alvarado, 840 F.3d 184, 189 (4th Cir. 2016); In re Grand Jury Procs. of Beverly,

468 F.2d 732, 743 (5th Cir. 1972); United States v. Woods, 544 F.2d 242, 250 (6th Cir. 1976);

United States v. Wadlington, 233 F.3d 1067, 1074 (8th Cir. 2000); United States v. Star, 470 F.2d

1214, 1217 (9th Cir. 1972); United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979);

United States v. US Infrastructure, Inc., 576 F.3d 1195, 1214 (11th Cir. 2009); see also United

States v. Aero Mayflower Transit Co., 831 F.2d 1142, 1145 (D.C. Cir. 1987) (court may quash

federal agency's investigative subpoena if it was issued for improper purpose); Trump v. Vance,

591 U.S. 786, 805–06 (2020) (strongly suggesting that courts should quash grand-jury subpoenas

with improper purpose).

That said, a subpoena might have been issued for multiple reasons, some proper and

others not. Where should courts draw the line? Almost all our sister circuits agree that a

subpoena should be quashed if its "sole or dominant" purpose is improper (or some variation of

those words). E.g., Flemmi, 245 F.3d at 28 (First Circuit asking whether "primary purpose" is

improper); Calk, 87 F.4th at 186 (Second Circuit: "sole or dominant purpose") (quotation marks

omitted); In re Grand Jury Procs., 632 F.2d 1033, 1041 (3d Cir. 1980) (Third Circuit: "sole or

dominant purpose"); Alvarado, 840 F.3d at 189 (Fourth Circuit: "sole or dominant purpose")

(quotation marks omitted); Grand Jury Procs. of Beverly, 468 F.2d at 743 (Fifth Circuit: "sole or

principal purpose"); Woods, 544 F.2d at 250 (Sixth Circuit: "sole or dominant purpose")

(quotation marks omitted); Wadlington, 233 F.3d at 1074 (Eighth Circuit: "sole or dominant

purpose") (quotation marks omitted); US Infrastructure, 576 F.3d at 1214 (Eleventh Circuit:

whether grand jury was "used solely or even primarily" for improper purpose) (quotation marks

omitted); but see Star, 470 F.2d at 1217 (Ninth Circuit suggesting that test is "sole purpose");

Gibbons, 607 F.2d at 1328 (Tenth Circuit saying that test is "primary purpose" but applying that rule as if test is sole purpose). Other courts in this district have adopted the "sole or dominant purpose" standard. In re Grand Jury 95-1 Subpoena Duces Tecum, 59 F. Supp. 2d 1, 15–16 (D.D.C. 1996); United States v. Sitzmann, 74 F. Supp. 3d 96, 123 (D.D.C. 2014).

In addition, the parties themselves expressly agreed at the hearing that this standard should govern. See Mar. Hearing Tr. at 15:24–16:2, 21:7–9. The Court will follow that overwhelming authority and thus inquire whether the subpoenas' sole or dominant purpose is improper.

3.    *Improper Purpose*

With the basic framework set, the Court now turns to what makes a purpose improper and the side of the line on which these subpoenas fall. It will first set out the central teachings from the caselaw, then apply them to this matter.

a.    Caselaw

Surveying precedents, the Court distills four lessons. First, courts have recognized two improper purposes that seem especially relevant here. For one, prosecutors may not use the grand jury "to engage in arbitrary fishing expeditions" or to "select targets of investigation out of malice or an intent to harass." United States v. R. Enters., Inc., 498 U.S. 292, 299 (1991). So if they singled out an opponent of the President "out of malice" or "to harass" him, including by fishing around for some crime to pin on him, that would not be kosher. Id.

Separately, Trump v. Vance suggests that if prosecutors are forbidden from meddling with an official's duties, then they cannot use criminal investigations to pressure him into enacting their preferred policies. In Vance, state prosecutors had issued grand-jury subpoenas seeking financial records concerning President Trump and his businesses. See 591 U.S. at 791–92. The

11

Court did not decide whether those subpoenas were proper, id. at 810–11, but it warned that state DAs cannot use grand-jury subpoenas to "interfer[e] with a President's official duties." Id. at 806. It reasoned that because the Supremacy Clause bars state prosecutors from interfering in the President's policy decisions, they cannot turn to subpoenas to try to "manipulate a President's policy decisions" or to "retaliate against a President for official acts." Id. (cleaned up). That warning extended a well-established principle: "[A] government official cannot do indirectly what she is barred from doing directly . . . ." NRA of Am. v. Vullo, 602 U.S. 175, 190 (2024); see also Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67–69 (1963) (Government may not use threats of prosecution to coerce people into doing what it cannot directly order them to).

As noted above, the President and his appointees may not interfere with the Fed Chair's choices about monetary policy. See 12 U.S.C. §§ 242, 263(a). Vance thus suggests that, in addition, the President's appointees may not use grand-jury subpoenas to pressure the Chair to take certain official actions or to retaliate against him for policies that they dislike.

While those two improper purposes seem especially relevant here, the caselaw's second teaching is that an abusive purpose need not be clearly identified in precedents for a court to deem it improper. Instead, improper purposes are as numerous and protean as are the opportunities for prosecutors to misuse their power. Consider the expansive (and expanding) list that courts have identified, often for the first time in the case then at bar. For example, prosecutors cannot harass a target with subpoenas "with no expectation that any testimony concerning the commission of a crime would be forthcoming." In re Maury Santiago, 533 F.2d 727, 730 (1st Cir. 1976). They may not use grand-jury subpoenas to get evidence for a separate civil case, thereby evading the rules of civil discovery. United States v. Sells Eng'g, Inc., 463 U.S. 418, 432–34 (1983). Or to get evidence for an already-indicted criminal case, thus skirting

12

criminal discovery. Wadlington, 233 F.3d at 1074. Or to demand details that are irrelevant to the crime under investigation but that would chill a target's First Amendment rights. Ealy v. Littlejohn, 569 F.2d 219, 227–30 (5th Cir. 1978). Or to subpoena journalists in bad faith, solely to expose confidential sources. Branzburg v. Hayes, 408 U.S. 665, 707–08 (1972); id. at 709–10 (Powell, J., concurring). Or to drag a witness before the grand jury over and over in the hopes that he might contradict himself and so expose himself to a perjury prosecution. Bursey v. United States, 466 F.2d 1059, 1079–80 (9th Cir. 1972).

With varied improper purposes popping up on different occasions, it is clear that such purposes cannot be reduced to a fixed and exhaustive list. In none of the cases above did the court take a subpoena's purportedly improper purpose, hold it up to the list of improper purposes that other courts had already recognized, and say that a match was required. Instead, when new facts present new ways that prosecutors might be abusing their subpoena power, courts do not hesitate to declare those purposes improper. See United States v. LaSalle Nat'l Bank, 437 U.S. 298, 317 n.19 (1978) (previous caselaw had listed some "examples" of bad faith, but not "an exclusive statement about the meaning" of bad faith); id. at 318 n.20 ("[f]uture cases may well reveal the need to prevent other forms of agency abuse" that case at hand did not consider); SEC v. Wheeling-Pittsburgh Steel Corp., 648 F.2d 118, 124 (3d Cir. 1981) (en banc) (Just "because the Supreme Court has never confronted allegations like the ones before us does not mean that the federal judiciary is powerless to structure relief when necessary.").

Returning to the case at hand, while these subpoenas' purpose would be improper if it resembled the forbidden purposes identified in R. Enterprises and Vance, that is not necessary. The Court would still quash them if they were issued for an improper purpose that prior cases had no occasion to identify.

13

Third, the Government is not necessarily acting for a proper purpose just because it seeks information relevant to a criminal investigation. Someone can move to quash a subpoena because it is irrelevant or because it serves an improper purpose. A subpoena thus might be quashed because it is irrelevant, regardless of its purpose. See R. Enters., 498 U.S. at 301 (setting out standard to challenge subpoena as irrelevant without considering purpose). Or it could be quashed for having an improper purpose, even though it asked for information relevant to a criminal investigation. Consider a subpoena hunting for evidence in an already-indicted case: it is plainly seeking relevant evidence, yet it is an improper purpose to use the grand jury to bolster trial testimony. Wadlington, 233 F.3d at 1074. Applying that principle here, the subpoenas are certainly relevant to a criminal investigation. Yet if they constitute an improper use of the grand jury, then they have an improper purpose.

Fourth, the strength of a movant's evidence of an improper purpose determines how much the Government must show to substantiate its asserted proper purpose. To be clear, the movant bears the burden of showing an improper purpose. R. Enters., Inc., 498 U.S. at 300–01. That burden is heavy, since it requires "rebutting the presumption of regularity attached to a grand jury's proceeding." Alvarado, 840 F.3d at 189 (cleaned up). And that presumption cannot be rebutted by mere speculation or conjecture. Cf. United States v. Millman, 765 F.2d 27, 29 (2d Cir. 1985) ("[M]ere conclusory allegations of wrongdoing unsupported by any evidence from which a court might draw an inference of abuse are insufficient . . . .").

That said, if the movant overcomes the presumption, then the Government's burden to justify a subpoena will depend on how much evidence of an improper purpose the movant puts forth. That follows naturally from seeking a subpoena's dominant purpose: the more evidence there is that the purpose is improper, the more is needed to show that a proper purpose

14

nonetheless dominated. Cf. United States v. Carey, --- F.Supp.3d ---, 2026 WL 141919, at *9–10 (D.D.C. Jan. 20, 2026) (to decide whether prosecutors acted for improper reasons, court must weigh evidence on each side). Since a grand-jury subpoena's proper purpose is investigating suspicious facts that might suggest a crime, that means showing a stronger basis for such investigation.

To be sure, the Supreme Court has held that the Government need not establish probable cause before issuing a grand-jury subpoena. R. Enters., 498 U.S. at 297. Yet the Court rejected that only as a universal threshold requirement. Id. As explained above, the separate rule that subpoenas may be quashed if their dominant purpose is improper requires weighing the evidence of improper purpose against the strength of the Government's reasons for issuing the subpoena. In the rare case when the evidence of improper purpose is overwhelming, that might require the Government to show something akin to probable cause. Even if the Supreme Court's caselaw should instead be read as holding that the Government need never show probable cause, there remains a wide range of showings below that threshold that a court might require to satisfy itself that the Government is not abusing the court's process. The question is purely academic in this case, however, since (as discussed below) the Government's complete lack of substantiation falls short of any possible showing that could be required.

With those lessons in hand, the Court applies them to the facts.

b.       These Subpoenas

The Board contends that the Government issued these subpoenas for the improper purpose of harassing and pressuring Powell to push the Fed to lower interest rates or to resign and make way for a more pliant Chair. See Mot. to Quash at 1, 14. There can be little debate that such purpose would be improper. As just discussed, existing caselaw warns that prosecutors

15

may not "select [a] target[] of investigation out of malice or an intent to harass." R. Enters., 498 U.S. at 299. And it implies that if prosecutors — or the President who appointed and can fire them — are legally barred from interfering in an official's policy choices, they may not use grand-jury subpoenas in an "attempt to influence" him or to "retaliate against [him] for official acts." Vance, 591 U.S. at 810–11 (cleaned up). True, no case says that federal prosecutors cannot target the head of an independent agency to pressure him to knuckle under or step aside. That purpose would still be improper, though: it would sic prosecutions on people because the President dislikes them, use criminal subpoenas as a form of official coercion, and thwart statutes protecting the agency's independence. Even if nobody has tried that before, a novel improper purpose is improper all the same.

What the Court must determine is whether the Board is correct in its inference. In other words, what is these subpoenas' dominant purpose? A mountain of evidence suggests that the dominant purpose is to harass Powell to pressure him to lower rates. For years, the President has publicly targeted Powell because the Fed is not delivering the low rates that Trump demands. E.g., Donald J. Trump (@realDonaldTrump), Truth Soc. (July 18, 2025, at 6:45 AM), https://perma.cc/A8JF-RB5F ("'Too Late,' and the Fed, are choking out the housing market with their high rate . . . . He is truly one of my worst appointments. . . . And the Fed Board has done nothing to stop this 'numbskull' from hurting so many people. . . . The USA is Rockin', there is VERY LOW INFLATION, and we deserve to be at 1% . . . . I can't tell you how dumb Too Late is — So bad for our Country!"); Donald J. Trump (@realDonaldTrump), Truth Soc. (June 19, 2025, at 10:04 AM), https://perma.cc/748P-CN6T ("'Too Late' Jerome Powell is costing our Country Hundreds of Billions of Dollars. He is truly one of the dumbest, and most destructive, people in Government . . . . TOO LATE's an American Disgrace!").

16

Take one of many examples of Trump pressuring Powell to lower rates, then attacking and threatening him when the Fed does not oblige. In the run-up to last July's FOMC meeting, Trump declared, "Our Rate should be three points lower than they are [*sic*], saving us $1 Trillion per year (as a Country). This stubborn guy at the Fed just doesn't get it — Never did, and never will. The Board should act, but they don't have the Courage to do so!" Donald J. Trump (@realDonaldTrump), Truth Soc. (July 23, 2025, at 9:08 AM), https://perma.cc/SNZ8-WPEA. Yet despite the President's badgering, the FOMC noted that "[t]he unemployment rate remains low, . . . labor market conditions remain solid[, and] [i]nflation remains somewhat elevated." Press Release, Bd. of Governors of the Fed. Rsrv. Sys., Federal Reserve Issues FOMC Statement (July 30, 2025), https://perma.cc/6RWV-6FWA. It therefore held rates steady. Id. The next morning, Trump posted, "Jerome 'Too Late' Powell, a stubborn MORON, must substantially lower interest rates, NOW. IF HE CONTINUES TO REFUSE, THE BOARD SHOULD ASSUME CONTROL, AND DO WHAT EVERYONE KNOWS HAS TO BE DONE!" Donald J. Trump (@realDonaldTrump), Truth Soc. (Aug. 1, 2025, at 6:32 AM), https://perma.cc/VBK4-ZC7Z. That afternoon, Trump fired the Commissioner of Labor Statistics and warned that "Jerome 'Too Late' Powell should also be put 'out to pasture.'" Donald J. Trump (@realDonaldTrump), Truth Soc. (Aug. 1, 2025, at 2:09 PM), https://perma.cc/9PRJ-W2HC. Hours later, he declared, "'Too Late' Powell should resign." Donald J. Trump (@realDonaldTrump), Truth Soc. (Aug. 1, 2025, at 6:05 PM), https://perma.cc/5ANS-L83M.

Indeed, the President has often said that he wants Powell out of the way. E.g., President Trump Delivers Remarks at the U.S.-Saudi Investment Forum (video at 42:01–:58) ("[H]e's got some real mental problems. There's something wrong with him. I'll be honest, I'd love to fire his ass. He should be fired. . . . I want to get him out . . . ."); Donald J. Trump

17

(@realDonaldTrump), Truth Soc. (Apr. 17, 2025, at 6:12 AM), https://perma.cc/R9WX-GBEU ("Powell's termination cannot come fast enough!"). Trump recently declared that if the Fed does not cut rates, "I may have to force something." Gangitano, Trump Calls Jerome Powell "Numbskull," Says He May "Force Something" on Fed.

When Trump is not openly considering getting rid of Powell, he is candidly looking forward to the day when Powell will be gone and replaced by a Chair who will vote how the President wants. E.g., President Trump Delivers Keynote Remarks at APEC CEOs Luncheon, The White House (Oct. 29, 2025), https://www.whitehouse.gov/videos/president-trump-delivers-keynote-remarks-at-apec-ceos-luncheon/ (video at 8:16–:35) ("[W]e have an incompetent head of the Fed. He's incompetent. . . . But he's out of there in another couple of months. We'll be very happy about that. We'll appoint somebody that we all like, because we should have the lowest interest rates of any country . . . .").

Apparently running out of patience, the White House recently launched a campaign to investigate Powell. Last July, William Pulte, the Director of the Federal Housing Finance Agency, posted a letter on X "asking Congress to investigate Chairman Jerome Powell" over "his political bias," the Board's renovations, and Powell's testimony about them — which, Pulte pointedly suggested, would let the President remove Powell for cause. See Pulte (@pulte), X (July 2, 2025, at 11:43 AM), https://perma.cc/22DT-7TH3. A few hours later, President Trump reposted an article about Pulte's letter, adding, "'Too Late' should resign immediately!!!" Donald J. Trump (@realDonaldTrump), Truth Soc. (July 2, 2025, at 6:10 PM), https://perma.cc/5JT8-EA36. Press Secretary Karoline Leavitt then announced that "the administration, led by the president, is looking into" the renovations. Fed's Powell Responds to White House on Fed Headquarters Renovation. Trump has since often called them out, along

18

with his usual demands for lower rates. E.g., Robert Mackey, Trump Says He'd "Love to Fire" Jerome Powell in Latest Attack on Fed Chair, The Guardian (Dec. 29, 2025), https://perma.cc/J75M-Z7WD (because of renovations' costs, "we're thinking about bringing a gross incompetence, what's called a gross incompetence lawsuit, it's gross incompetence, against Powell . . . I'd love to fire him. Maybe I still might.").

Where Pulte and Trump pointed, the U.S. Attorney's Office followed. It opened a grand-jury investigation into the renovations and Powell's testimony and served the two subpoenas at issue here.

In sum, the President spent years essentially asking if no one will rid him of this troublesome Fed Chair. He then suggested a specific line of investigation into him, which had been proposed by a political appointee with no role in law enforcement, who hinted that it could be a way to remove Powell. The President's appointed prosecutor promptly complied. Those facts strongly imply that this investigation was launched for an improper purpose, as were the resulting subpoenas.

True, most of the evidence above speaks to the motives of the President, not the U.S. Attorney's Office. Yet judges "are not required to exhibit a naiveté from which ordinary citizens are free." Dep't of Com. v. New York, 588 U.S. 752, 785 (2019) (quotation marks omitted). The U.S. Attorney was appointed by the President and can be fired by him. Her peer one district over was recently pushed out for refusing to prosecute the President's opponents. United States v. Comey, --- F. Supp. 3d ---, 2025 WL 3266932, at *2–3 (E.D. Va. Nov. 24, 2025). The signal to other U.S. Attorneys was hard to miss. Indeed, this U.S. Attorney's Office has targeted the President's opponents before. Compare, e.g., Donald J. Trump (@realDonaldTrump), Truth Soc. (Nov. 20, 2025, at 9:17 AM), https://perma.cc/6CKS-7LPA (reposting article about Democratic

19

members of Congress who posted video telling service members to refuse illegal orders and commenting, "This is really bad, and Dangerous to our Country. Their words cannot be allowed to stand. SEDITIOUS BEHAVIOR FROM TRAITORS!!! LOCK THEM UP???"), with Alan Feuer, Glenn Thrush & Michael S. Schmidt, Grand Jury Rebuffs Justice Dept. Attempt to Indict 6 Democrats in Congress, N.Y. Times (Feb. 10, 2026), https://perma.cc/TY69-XV55 (D.C. U.S. Attorney's Office then tried to indict all six of those congresspeople). It is a natural inference that the President's appointee was responding to his desires (whether real or perceived) here.

Against such extensive and persuasive evidence of improper motive, the Government counters with only a tenuous assertion of a legitimate purpose. In its briefing, the Government's sole justification for investigating the renovation is that it went "far over budget, raising the specter of fraud." Gov. Opp. to Mot. to Quash at 6. But buildings often go over budget. That fact, standing alone, hardly suggests that a crime occurred. Nor is there any reason to think that this project was especially prone to fraud. On the contrary, the Board's "independent Inspector General . . . has had full access to project information on costs, contracts, schedules, and expenditures and receives monthly reports on the construction program." ECF No. 5-4 (Powell Letter) at 4. He audited the renovation several years ago and raised no concerns about fraud. Id.; Mot. to Quash at 24.

As for Powell's testimony, the Government vaguely intimates that it "contained possible discrepancies" and was "possibly problematic." Gov Opp. to Mot. to Quash at 2 & n.1. What those discrepancies or problems might be, it does not (or cannot) say. Indeed, most members of the Committee that Powell testified before — including a majority of each party's members, as well as the Committee's Chair — have said that they do not think he committed any crime. See 172 Cong. Rec. S601 (daily ed. Feb. 12, 2026) (statement of Sen. Thom Tillis); Letter to

20

Chairman Scott (Feb. 3, 2026), https://perma.cc/E6J9-PPYH; Nick Timiraos, Top Republican Senator Says Fed's Powell Didn't Commit a Crime, Wall St. J. (Feb. 4, 2026), https://perma.cc/W4NV-ECV5. Searching for any reason to suspect that Powell might have lied to Congress, the only one the Court can descry is that he testified at a hearing. The Government might as well investigate him for mail fraud because someone once saw him send a letter.

Of course, the Government might not want to tip its hand by showing its investigation's target — i.e., Powell or the Board — what evidence it has already collected. Indeed, many prosecutors would understandably want to hold their cards close to the vest. Respecting this prerogative, the Court at the hearing invited the Government to submit any additional justifications for the subpoenas ex parte. See Mar. Hearing Tr. at 19:2–5; cf. R. Enters., 498 U.S. at 302 (noting that "a district court may require that the Government reveal" information about grand-jury subpoena "to the trial court in camera, so that the court may determine whether the motion to quash has a reasonable prospect for success"). In fact, in other recent cases in which subpoena targets have moved to quash, the Government has submitted ex parte the evidence that led it to suspect wrongdoing. In re Grand Jury Subpoena ███████████, No. 26-mc-2, ECF No. 14 (Gov. ex parte Suppl.) (D.D.C. Feb. 11, 2026); In re Grand Jury Subpoena ███████████, No. 26-mc-7, ECF No. 13 (Gov. ex parte Suppl.) (D.D.C. Feb. 12, 2026). In our case, however, the Government at the hearing declined to offer any other evidence. See Mar. Hearing Tr. at 19:6–14. Nor has it supplied any written ex parte submission. The Court is thus left with no credible reason to think that the Government is investigating suspicious facts as opposed to targeting a disfavored official.

When the evidence of improper motive is so strong and the justifications for these subpoenas are so tenuous, it is hard to see the renovations and testimony as anything other than a

21

convenient pretext for launching a criminal investigation that the Government launched for another, unstated purpose: pressuring Powell to knuckle under. In light of all the evidence, the only reasonable inference is that the Government targeted Powell "out of malice or an intent to harass" and has launched a "fishing expedition[]" to either find something to pin on him or to pressure him to fold. R. Enters., 498 U.S. at 299. That harassment seems aimed at bulldozing the Fed's statutory independence. Cf. Vance, 591 U.S. at 806, 809 (prosecutors cannot use subpoenas in "attempt to influence the performance of . . . official duties" that law bars them from controlling). The Court will therefore grant the Motion to Quash.

B.     Motion to Unseal

Next up is the Board's Motion to Partially Unseal. Grand-jury investigations play out on two fronts. First, there is what happens in the grand-jury room itself, where witnesses testify and the grand jury observes, deliberates, and votes. Those proceedings take place in "an unusual setting where privacy and secrecy are the norm." In re Grand Jury Subpoena, Miller (Miller I), 438 F.3d 1141, 1150 (D.C. Cir. 2006) (quotation marks omitted).

Second, there are legal disputes that are related to but not a part of the matter in front of the grand jury. In re Motions of Dow Jones & Co., 142 F.3d 496, 498 (D.C. Cir. 1998). Those so-called ancillary proceedings typically involve fights over what may be presented to the grand jury — disputes over privileges, requests for immunity, motions to compel, and (relevant here) motions to quash. Id. Whereas grand-jury proceedings are conducted in secret before the grand jury with no judge presiding, id., ancillary proceedings are litigated through motions filed on a docket and decided by a judge outside the grand jury's presence. See LCrR 6.1. The briefs in an ancillary proceeding, along with the resulting opinion, are therefore judicial records. CNN, Inc. v. FBI, 984 F.3d 114, 118 (D.C. Cir. 2021); In re Leopold, 964 F.3d 1121, 1128 (D.C. Cir. 2020).

22

In ordinary cases, those records are presumptively accessible to the public. Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978); CNN, 984 F.3d at 118. Because of the need to preserve grand-jury secrecy, however, records in ancillary proceedings are sealed to the extent that they would reveal previously unknown details of the grand jury's investigation. Dow Jones, 142 F.3d at 500–01. That principle is codified in Federal Rule of Criminal Procedure 6(e)(6), which seals ancillary proceedings' records "to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury."

When facts are already publicly known, however, they lose that 6(e) protection. In re North, 16 F.3d 1234, 1244–45 (D.C. Cir. 1994); In re Grand Jury Subpoena, Miller (Miller II), 493 F.3d 152, 154 (D.C. Cir. 2007) ("[G]rand jury secrecy is not unyielding when there is no secrecy left to protect.") (quotation marks omitted). That only makes sense: if everyone already knows about a matter occurring before the grand jury, then sealing is no longer "necessary to prevent [its] disclosure." Fed. R. Crim. P. 6(e)(6). To remove 6(e) protection, however, the disclosure must have been made by someone with "authoritative knowledge of the matter." In re Reps. Comm. for Freedom of the Press, 2025 WL 92363, at *6 (D.D.C. Jan. 14, 2025). Authoritative sources include the subpoenaed witness himself, Miller II, 493 F.3d at 154–55; In re Press Application, 678 F. Supp. 3d 135, 142 (D.D.C. 2023); In re Politico LLC, 2025 WL 2029757, at *2, *6 (D.D.C. July 21, 2025), as well as the prosecution. North, 16 F.3d at 1244; Politico, 2025 WL 2029757, at *6. To the extent that ancillary records would reveal such already-known details, then, they may be unsealed.

Here, the Board seeks to unseal redacted versions of its Motion to Quash, the Government's Opposition to that Motion, the Board's resulting Reply, and this Opinion. See Mot. to Unseal at 9; Mar. Hearing Tr. at 10:10–20. Despite what the Government suggests in its

Opposition, see ECF No. 13 (Opp. to Mot. to Unseal) at 5–6, those documents are not themselves protected by grand-jury secrecy. Instead, they are records of an ancillary proceeding. The question is therefore whether unsealing them would reveal previously unknown details about "a matter occurring before the grand jury," Fed. R. Crim. P. 6(e)(6) — such as the existence of the investigation into Powell, the subpoena seeking records related to the renovations, and the subpoena seeking records related to Powell's testimony.

The answer is clearly no. Those details have already been authoritatively disclosed. The Board posted a statement by Powell saying that "[t]he Department of Justice served the Federal Reserve with grand jury subpoenas . . . related to my testimony before the Senate Banking Committee last June," which "concerned in part a multi-year project to renovate historic Federal Reserve office buildings." Chair Jerome H. Powell, Statement from Federal Reserve Chair Jerome H. Powell, Bd. of Governors of the Fed. Rsrv. Sys. (Jan. 11, 2026), https://perma.cc/7TE6-FHRQ. The statement added that the subpoenas were meant to retaliate against the Board, not to legitimately seek information about their purported targets: "my testimony last June" and "the renovation of the Federal Reserve buildings." Id.

For good measure, U.S. Attorney Jeanine Pirro confirmed the disclosure. She explained, "The United States Attorney's Office contacted the Federal Reserve on multiple occasions to discuss cost overruns and the chairman's congressional testimony, but were ignored, necessitating the use of legal process . . . ." US Attorney Pirro (@USAttyPirro), X (Jan. 12, 2026, at 8:29 PM), https://perma.cc/V5UY-665P. She elaborated on Fox News that she had made "a legal request." Jeanine Pirro Addresses Critics of Fed Reserve Investigation, at 1:05–12, Fox News (Jan. 13, 2026), https://www.foxnews.com/video/6387691121112 (video at 1:05–:12). She then seemed to confirm those requests' focus: "We're talking about a billion dollars in cost

overruns . . . as well as lying before Congress. So both of these things are issues that I looked at. . . . We issued legal process." Id. at 1:35–2:37.

Two authoritative sources — the subpoenaed witness and the U.S. Attorney herself — have therefore already revealed that this grand-jury investigation exists, that it is inquiring into the renovations and Powell's testimony, and that the Board was served with subpoenas asking about those matters. Anything in the relevant records that would otherwise reveal those details may now be unsealed.

The Board has proposed redactions that would preserve the secrecy of some still-unknown details. See ECF Nos. 10-1 (Proposed Redactions to Mot. to Quash); 15-1 (Proposed Redactions to Gov. Opp.); 15-2 (Proposed Redactions to Reply). It has not, for example, asked for the disclosure of the subpoenas themselves, just the parts of its Motion that give a very general description of them. The Court agrees that those redactions are proper and sufficiently protect the Government.

The Government has proposed two more redactions to the Board's Motion to Quash, neither of which is needed. First, it wants to redact a sentence noting that one subpoena "requests materials regarding Chair Powell's testimony before the Senate Banking Committee . . . on June 25, 2025, and specifically, his testimony concerning the Federal Reserve's ongoing renovation projects." ECF No. 18-1 (Gov. Proposed Redactions) at 11. The Board, however, already disclosed that fact in no uncertain terms. Statement from Federal Reserve Chair Jerome H. Powell ("The Department of Justice served the Federal Reserve with grand jury subpoenas . . . related to my testimony before the Senate Banking Committee last June," which "concerned in part a multi-year project to renovate historic Federal Reserve office buildings."). Second, the Government seeks to redact a statement that the other subpoena

25

"requests materials related to the renovations about which Chair Powell testified." Gov. Proposed Redactions at 12. Yet that fact has also been disclosed. U.S. Attorney Pirro revealed that her office used "legal process" to follow up on its requests about "cost overruns." US Attorney Pirro (@USAttyPirro), X (Jan. 12, 2026, at 8:29 PM), https://perma.cc/V5UY-665P. In a later interview, she emphasized that "I looked at" "a billion dollars in cost overruns" and "issued legal process." Jeanine Pirro Addresses Critics of Fed Reserve Investigation at 1:35–2:37. She thereby revealed this subpoena's focus, leaving no secrecy for redaction to protect.

The Court will thus unseal the Motion to Quash, the Government's Opposition, and the Board's Reply with the Board's proposed redactions. It will also unseal this Opinion. Although the Court believes that it has drafted the Opinion in a manner that requires no redactions beyond subpoena numbers, it will give the parties an opportunity to propose further redactions. Finally, to permit the Government to appeal the unsealing and obtain a stay, the Court will not publicly release its Opinion, accompanying Order, and underlying briefing until 3:00 PM on Friday, March 13, 2026, to avoid mooting any potential appeal.

## III.    Conclusion

A mountain of evidence suggests that the Government served these subpoenas on the Board to pressure its Chair into voting for lower interest rates or resigning. On the other side of the scale, the Government has produced essentially zero evidence to suspect Chair Powell of a crime; indeed, its justifications are so thin and unsubstantiated that the Court can only conclude that they are pretextual. The Court therefore finds that the subpoenas were issued for an improper purpose and will quash them. It will also unseal redacted versions of the Motion to Quash, related briefing, and this Opinion.

26

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: March 11, 2026